### JUAN RODRIGUEZ v. THE STATE.

No. 485. Decided March 2, 1910.

**1.—Murder—Charge of Court—Self-Defense—Apparent Danger.**

Where, upon trial for murder, the evidence showed that the deceased started from the house with a pistol in his hand towards the defendant, ordering him to leave, and the court charged the jury on self-defense limiting the alleged attack of deceased to an actual attack, and failed to charge on apparent danger, the same was reversible error.

**2.—Same—Evidence—Confessions—Arrest.**

Where, upon trial for murder, inculpatory statements made by defendant while under arrest were admitted in evidence, without conforming to the statute which requires such statement to be in writing, etc., the same was reversible error.

Appeal from the District Court of Frio. Tried below before the Hon. J. F. Mullally.

Appeal from a conviction of murder in the second degree; penalty, twenty years imprisonment in the penitentiary.

The opinion states the case.

No brief on file for appellant.

*John A. Mobley,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of murder in the second degree and his punishment was assessed at twenty years in the penitentiary. The evidence for the State discloses that William Armstrong was shot to death by appellant at his, Armstrong's, home on or about the 5th or 6th of June, 1903; that appellant fled the country and went to Mexico, from which place he was brought back after an absence of something like five years. Tom Armstrong testified in regard to the immediate facts attending the killing, in substance, as follows: That he was a cousin of deceased and was at the residence of deceased the night of the killing; that he and deceased were sitting on the front porch when appellant and Mateo Andrado came to the house; that they came upon the porch and a conversation ensued between the two Mexicans and the deceased; that deceased owed Mateo Andrado a small amount of money, something less than a dollar; that Mateo did not understand English and appellant did the talking; that deceased asked them why Mateo did not come over the Saturday before or meet him in Pearsall so that he could pay the money; that deceased informed them that he had no money but would pay him the next Saturday, or would then pay him in provisions, if he wanted it that way; that Mateo replied that he had plenty of provisions and did not want his money that way, but that if deceased would meet him the next Saturday and pay him, it was all right; that appellant then spoke and said, "No, you must pay him now," and

Will Armstrong told Rodriguez that it was none of his business and ordered them off the premises; that deceased and appellant talked a few minutes, then deceased got up and went in the house and got his pistol; that when he came back appellant jumped behind witness and asked deceased not to shoot him; that deceased said he did not want to shoot him, but wanted him to leave the place and not come back; that both Mexicans left the house and went out of the gate. Appellant upon passing out of the gate turned to the left down the fence towards a Mexican camp, which was about sixty or seventy feet to the left of the gate under a live oak tree; that deceased in the meantime had lighted a lantern, and when he saw appellant turn towards the camp he stepped off the porch with the lantern in his left hand and the pistol in his right, both arms hanging by his sides, and said, "I told you to leave the premises;" that he had not taken more than two steps towards the fence when appellant fired; that the next two shots came so close together that witness could not say who fired the second shot; that deceased fired two shots, and at the third shot from the Mexican deceased fell; that appellant then fired two shots in his, witness', direction and started in the gate; the witness thought two shots were fired at him because two shots "whizzed close" to him and entered the door of the house and one shot struck the stove, went in the house and towards the back of it. This witness further stated he heard someone whom he took to be appellant step upon the porch and as witness went out of the back of the house he heard him come in the house, working his pistol like he was reloading it. On cross-examination this witness stated that when deceased got his pistol and appellant got behind him, witness, appellant begged deceased not to shoot him, that deceased was not making motions with his pistol like he desired to shoot; that he told appellant to leave the place, and repeated this two or three times before the Mexicans started to the gate. He says deceased did not curse appellant, but after appellant got outside of the gate he was going towards the camp, at which time deceased stepped off the porch going in that direction. This witness says there were only four people present, deceased, the two Mexicans and himself, when this happened. That there were some Mexicans at the camp above mentioned. That this killing occurred just after dark about 8 o'clock. Campbell testified for the State that appellant was working for him; that on Friday afternoon before the shooting, appellant, Mateo Andrado, and Artuco, another Mexican, were in the commissary on his place, and after the other Mexicans left witness and appellant together, appellant told him that deceased owed, either Mateo or himself, witness had forgot which, forty cents, and that they were going over to deceased's place to collect it, and that deceased would either pay it or something would happen to one of them; that he, witness, told him not to talk that way; that appellant then went away and later that night he heard shots, but that he had not told anyone about this conversation with appellant until just about fifteen minutes before he

was testifying. This is practically the State's case. Appellant testi-
fied in his own behalf that he had worked for deceased on his farm
a few days and while working there he met Mateo Andrado; that he
had known the brother of Mateo Andrado in Laredo; that a few
days afterwards he left deceased's employment and went over to Camp-
bell's place because the wages were better and Mateo accompanied him.
Appellant further states that Mateo told him that deceased owed him
a few cents and invited appellant to go over with him to collect it, as
he could not speak English and appellant could talk a few words here
and there; that upon reaching the residence of the deceased, deceased
and the young man, Tom Armstrong, were sitting on a cot on the
front porch; that he and Mateo went in and after the ordinary salu-
tations and after talking awhile appellant asked Mateo if he was going
to request the deceased to pay the few cents; that Mateo said yes, and
appellant then asked Armstrong for the money; that Armstrong said
he would pay him another time or he would then pay him in provisions,
but Mateo said he did not want provisions, as he had plenty from
Campbell's; that deceased then asked appellant if it was any of his
business about his and Mateo's accounts and appellant told him it
was not; whereupon deceased became angry and ordered him to leave;
that he, appellant, remarked to Andrado that they should be going,
but before they could get away deceased went in the house, came out
with a pistol and said he was going to kill him, appellant, like a dog;
that he jumped behind the witness Tom Armstrong and dodged from
side to side to keep deceased from shooting him with the pistol, which
he kept trying to do; that he begged deceased not to shoot him; that
deceased finally quit and Andrado and himself, appellant, started and
went out of the gate; that Andrado was ahead and on leaving the gate
started to the left, and he, appellant, turned to the right; that Andrado
then said come on and say good-bye to the Mexicans in the camp; that
he replied that Armstrong, deceased, was angry and to let's go; that
Andrado insisted there was no danger, so he, appellant, started across
the front of the gate towards where Andrado was and to the left of
the gate; that when he did this deceased stepped off the porch with
his pistol in his hand and said, "You damned son-of-a-bitch, I told
you to leave here," and shot at him; that when deceased shot he, ap-
pellant, threw himself upon the ground and pulled his pistol which
he had in his coat which was thrown loosely over his shoulders and
returned the fire. He says there was so much dust and smoke that
he could not tell what direction he was shooting, but fired all the cart-
ridges in his pistol, in number about five; that deceased fired two shots
and fired the first shot. Appellant says that when he saw deceased
start in his direction cursing him, he thought deceased was going to
kill him and he shot in defense of himself. Appellant further states
that after the shooting he saw young Tom Armstrong going in the
house, and being afraid he was going to get a gun with which to shoot
him, he went in the yard and ran around behind the house and hid;

that he did not reload his pistol. The pistol used by the appellant was a 38; that used by the deceased was a 45. One shot struck deceased in the left eye killing him instantly. The State used Mateo Andrado in rebuttal as a witness. It is unnecessary to repeat all of his testimony. It is not materially different in respect to the case up to the time of the shooting from the testimony of the other witnesses. Coming down to the immediate facts attending the killing, he says that after informing the deceased that his promise to pay him the following Saturday was satisfactory, the deceased and appellant talked a few moments, but he could not understand anything that was said, as he was not familiar with the English language, and they were talking in English. That deceased got up, got a pistol and appellant got behind Tom Armstrong. He says they were talking then but he did not know what they were saying; that he and the appellant then left and went outside the gate; that appellant said let's go to the camp and say good-bye to the Mexicans at the camp; that just at this juncture deceased stepped off the porch with his pistol and lantern and said something to appellant which he did not understand; that he saw appellant pull his pistol and shoot, but he does not remember who fired the first shot; that after appellant fired the first time he fell on the ground and witness thought he was killed; that appellant shot five times and deceased twice. He also states that deceased had a pistol down by his side in his hand when he stepped from the porch. Then follows a description of the house and the yard and the condition of things, but it is only necessary to state that it was just a short distance from the house to the witness and about sixty or eighty feet from the gate to the Mexican camp to which the parties were going at the time the shooting occurred. It is further shown that the body of deceased was found a little to one side of the walk from the gate to the house with a pistol by his side with two empty chambers.

The court's charge on self-defense limited appellant's right on this theory of the facts to an actual attack. If the deceased fired the first shot it was unquestionably an actual attack and justified this phase of the law. The evidence, however, clearly suggests a case of apparent danger. The Mexican Mateo Andrado leaves it in doubt as to who fired first. Tom Armstrong says appellant fired the first shot. Appellant says deceased fired the first shot. The testimony seems to be uncontroverted that the deceased started from the house towards appellant with his pistol in his hand and ordered appellant to leave his premises. This raises the question of apparent danger. Deceased had his pistol on appellant on the gallery when he jumped behind Tom Armstrong and in obedience to the command of deceased was leaving the premises. It appears that on account of the fact that appellant turned to the left to go to the Mexican camp it angered deceased, and he started in the direction of appellant with his pistol in one hand and a lantern in the other and that he was talking in a way to the appellant that indicated that he might anticipate serious trouble. The

court did not charge on apparent danger. Appellant requested an instruction which was refused. We are of opinion the charge asked was pertinent, applicable, timely and should have been given.

A bill of exceptions recites that while appellant was on the stand as a witness, the State was permitted over his objections to ask the following question: "Did you not state to Mr. Riggan, the sheriff here, and Less Petty on the train from Laredo as they were bringing you back from Mexico that you owed the debt, and might as well pay it now as at any other time?" Various objections were urged to this, among others, that it was prejudicial, and illegal and inadmissible for the following reasons, to wit: That at the time appellant was under arrest; that the statement was not in writing, nor was it made after the appellant was duly warned and that its object and purpose was to get before the jury a plea of guilty on the part of defendant foreign to the mind of defendant at the time made. These objections were overruled and appellant was forced to answer: "Yes, I made the statement," and said evidence was permitted to go to the jury and considered by them. We are of opinion this evidence was inadmissible and was used as a confession. The statement was made while appellant was under arrest. It was not in writing and was violative of the statute.

For the errors indicated, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*