## J. W. JOHNSON v. THE STATE.

### No. 1327. Decided June 23, 1911.

**1.—Murder—Special Venire—Bill of Exceptions.**

Where, upon appeal from a conviction of murder, it appeared from the record that defendant demanded a complete venire, which was overruled, that no copy or return of the sheriff was included or attached to his bill of exceptions, and no motion was made to quash the venire, and the bill did not state that any injury was suffered, there was no reversible error.

**2.—Same—Charge of Court—Express Malice.**

Where the definition of murder in the first degree as a whole was correct, there was no error.

**3.—Same—Charge of Court—Erasures.**

Where the words said to have been erased in the charge of the court did not appear in the record on appeal, there was no error.

**4.—Same—Charge of Court—Manslaughter—Provocation.**

Where the charge of the court on manslaughter was full and complete, when taken as a whole, on the question of provocation, there was no error.

**5.—Same—Charge of Court—Self-Defense—Abandonment of Difficulty.**

Where the court's charge on abandonment of the difficulty did not instruct the jury that if the defendant's mind, by the previous conduct of the deceased, was rendered incapable of cool reflection, he would not be guilty of any higher grade of offense than manslaughter, the same was reversible error.

**6.—Same—Charge of Court—Self-Defense—Attack.**

Where, upon trial of murder, the evidence showed that the deceased cursed the defendant, throwing his hand to his hip pocket, the jury should have been instructed that if by the act and conduct of deceased it reasonably appeared to defendant that his life was in danger he had a right to shoot, and the charge of the court assuming that the deceased had made an actual attack on the defendant, in the court's charge on self-defense, was too restrictive.

**7.—Same—Argument of Counsel.**

Counsel should never testify in their arguments, and especially should they not tell the jury what the evidence would have been had the court permitted them to introduce such testimony.

**8.—Same—Evidence—Husband and Wife—Cross-Examination.**

The cross-examination of the wife of the accused, if she is placed on the witness stand, should be limited to matters about which she testifies in her direct examination.

Appeal from the Criminal District Court at Dallas. Tried below before the Hon. Robt. B. Seay.

Appeal from a conviction of murder in the first degree; penalty, imprisonment in the penitentiary for life.

The opinion states the case.

*M. M. Brooks,* for appellant.—On question of the special venire: Logan v. State, 54 Texas Crim. Rep., 74, 111 S. W. Rep., 1028; Horn v. State, 50 Texas Crim. Rep., 404, 97 S. W. Rep., 822.

On question of argument of counsel: Young v. State, 55 S. W. Rep., 331.

On question of abandonment of difficulty: Huddleston v. State, 54 Texas Crim. Rep., 93, 112 S. W. Rep., 65; Mitchell v. State, 49 Texas Crim. Rep., 545, 96 S. W. Rep., 43; McMahon v. State, 81 S. W. Rep., 296; Renow v. State, 49 Texas Crim. Rep., 281, 92 S. W. Rep., 801; Derden v. State, 56 Texas Crim. Rep., 396, 120 S. W. Rep., 485; Hobbs v. State, 16 Texas Crim. App., 517; Rockhold v. State, id., 577.

On question of provocation: Huddleston v. State, 54 Texas Crim. Rep., 93, 112 S. W. Rep., 65; Akin v. State, 56 Texas Crim. Rep., 324, 119 S. W. Rep., 863.

On question of court's charge on manslaughter: Casey v. State, 54 Texas Crim. Rep., 584, 113 S. W. Rep., 535; Parnell v. State, 54 Texas Crim. Rep., 498; id., 536; Lee v. State, 54 Texas Crim. Rep., 382; id., 301.

On question of actual attack: Gregory v. State, 50 Texas Crim. Rep., 73, 94 S. W. Rep., 1041; Watson v. State, 95 S. W. Rep., 116; Puryear v. State, 50 Texas Crim. Rep., 454, 98 S. W. Rep., 258; Lockhart v. State, 53 Texas Crim. Rep., 589, 111 S. W. Rep., 1024.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, JUDGE.—Appellant was indicted, charged with the murder of Levi McGuffey. Upon a trial he was convicted of murder in the first degree and his punishment assessed at confinement in the penitentiary for life.

It appears that appellant purchased some furniture from J. D. Smith on the "installment plan." Deceased was a collector for Smith, and upon appellant getting behind in his payments, McGuffey went to his restaurant (which was also his residence) in an effort to collect the amount due, and upon appellant telling him he was unable to pay that day, threatened to take the furniture under the terms stated in the mortgage. Appellant relates the events as follows:

"It was about the 13th of April, to the best of my knowledge, when the deceased came out and first trouble occurred; he came in the restaurant at that time and asked me for a payment on this account, and I told him that I was not prepared to make a payment and asked him to wait until Saturday. This was, I think, to the best of my recollection, sometime either on Monday or Tuesday; I asked him if he would wait until Saturday and I would make him a payment then. He said that he would not wait. I insisted, and treated him with all the courtesy I could, and told him that if he could his leniency would be appreciated. He said that he would not. I told Mr. McGuffey that I thought he was rather hard with me; that I was doing the very best I could to try to get along, and I says, 'wish you would wait until Saturday.' He says, 'I will not wait;' he says, 'I want the goods or the money.' So I says, 'Mr. McGuffey, I don't care to lose what I have paid on this account, nor I don't want you to come in and take the stuff away from me.' I says, 'I will take this matter up with Mr. Smith.' He said, 'Mr. Smith hasn't got a damn thing to do with it.' 'Well,' I says, 'Mr. McGuffey, I will tell you, if you want the furniture you will have to get it through process of law;' I says, 'If the law gives it to you, you can have it.' He says, 'To hell with the law;' he says, 'I have got possession,' and he says, 'I am going to hold it.' I says, 'No, Mr. McGuffey, I have paid rent on this place and I don't care to have any trouble with you, and that is the only way you will get it, through process of law.' He says, 'I will get the furniture or I will get you;' he says, 'that is sure.' 'Why,' he says, 'what are you?

You look like fifteen cents' worth of dog meat to me.' He says, 'You are a God damn mother-fucking son of a bitch.' I says to Mr. Mc-Guffey, I says, 'Mr. McGuffey, I don't like for you to talk that way here in the presence of my wife. He says, 'What is that, that damned whore?' I started from behind the counter and told him he must get out, and then I started around the end of the counter, and he stepped back and threw his hand on his hip pocket, and says, 'You stop, or I will kill you.' Well, I stopped. He walked to the screen door, looking back at me, inclined to go sideways to the door. He pushes this screen door open and walked out, and he says, 'You damned bastard, I will get you yet.' That was the last time I saw Mr. McGuffey until he came back on the 26th of April, the day this trouble came up." When deceased left, appellant telephoned Mr. Smith, and requested that deceased be not again sent to his restaurant to collect, he alleging and stating that deceased's conduct was insulting, and if they would not again send McGuffey, he would pay at the store. The next week they did make a partial payment at the store. That appellant did telephone to the store about McGuffey's conduct is borne out by State's witnesses; also that it was agreed if he would pay at the store deceased would not again be sent down there, and that a payment was made during the next week. This, however, still left appellant in arrears, and about a week or ten days after appellant had made the partial payment McGuffey again went to appellant's place of business, and lost his life. As to what occurred in the restaurant on the morning of the killing we have nothing but the statement of appellant and his wife, and the dying declaration of deceased—that appellant had killed him for nothing.

The State's witnesses say that their attention was attracted by the first shot, and when they looked deceased was coming out of the door, and in a short space of time appellant appeared at the door, one saying he stood in the door, two saying he advanced out on the sidewalk, all three testifying that he fired three shots as deceased was crossing the street. Deceased was hit twice, once in the left side and once in the back, near the spinal column, the last being the fatal shot. State's witnesses say that deceased had no weapon of any character, and after he came within their vision he did nothing showing an intention to injure appellant. One of the State's witnesses says appellant appeared excited, while the other says he appeared cool and collected.

The appellant testifies, and is corroborated in the main by his wife, that his wife was sick in the room adjoining the restaurant. That he (appellant) went to the rear on some errand, and when he returned deceased was standing at the foot of the bed on which his wife lay, when he asked him what he was doing there, and deceased replied: " 'It was none of my damned business;' then I asked him to get out of my house, and he stepped back into the lunch room where the lunch counter was, and I walked to the door and asked him to get out; he threw his hand to his hip pocket and said, 'You son of a bitch,

I will make you get out,' and then is when the shooting commenced. My pistol was lying on the machine just inside of the bedroom where the door goes in from the lunch counter; when he spoke to me the way he did, and said, 'I will make you get out, you son of a bitch,' and made for his pistol, I shot him; when I fired the first shot he turned with his face facing the counter, with his hand still on his pocket. That would put his left side or his back next to me; I continued to shoot at him as long as I saw him in that position while he was on the inside of the house. He still had his hand on his hip pocket when I shot the other shots. Then he walked toward the screen door, the exit of this lunch room, the front door; then he stopped, and turned with his face back to this door. I thought he was going to still continue to shoot me, and I shot again; that was the last shot I fired. He went out the screen door, or backed out the screen door, and walked out on the sidewalk. I don't have any recollection of shooting any other shots. I was greatly excited right at that time."

The dying declaration of deceased, as introduced in evidence, is as follows: "The man shot me for nothing; he told me not to come back any more, and I went there this morning. He told me to get out of his house, and I told him that I would." He said, "Johnson picked up a pistol as I went out, and as I turned the screen door he shot me in the side, and if you will look you will find a hole in the screen, and as I turned and ran up the street he shot me in the back, and that is what is killing me."

This presents the theories of the State and defendant and issues to be submitted to the jury.

The first contention of appellant is that it appeared "the court had ordered a venire of 200 men, which was a special venire duly selected and drawn out of the jury wheel, as provided by law, for Dallas County and other counties in Texas. When the case was called for trial, and after the State and the defendant had announced ready, the special venire was thereupon called, and only sixty-seven of the 200 special veniremen responded; of this number all were excused by the court or by consent except forty; and thereupon the defendant demanded a complete venire out of which to select his jury before being required to proceed with the qualification and selection of his said jury in this case; said demand was overruled by the court, and the defendant was forced to proceed and exhaust that part of the venire." After this list was exhausted, the court ordered the sheriff to summon talesmen to complete the jury. No copy of the venire or the return of the sheriff is included in or attached to the bill of exceptions, and we are left to surmise, if we so desire, a reason why the others were not summoned or were not in attendance. No motion was made to quash, and the bill does not state any injury was suffered by reason of being thus compelled to select a jury. In the absence of a motion to quash stat-

ing grounds sufficient, and it not being shown that appellant suffered any injury, we hold there was no error.

The most serious contention is the complaint of the charge of the court in several particulars. The error assigned that the court erred in omitting the word "express" before the word malice in the definition of murder in the first degree, is not well taken. The definition of murder in the first degree is not well taken. The definition as a whole, and especially when applying the law to the facts, presents fully what it takes to constitute murder in the first degree, and that portion of the motion which complains that a portion of the printed charge had a pencil through a portion of it can not be reviewed, as the charge before us has no such erasures, and the words said to have been erased do not appear in the charge copied in the record. That portion of the motion complaining of the charge on manslaughter, wherein it is said "the provocation must arise at the time of the commission of the offense, and that the passion is not the result of a former provocation," presents no error, as the court later on in the definition instructed the jury that, "in determining the adequacy of the provocation, to consider in connection therewith all the facts and circumstances in evidence in passing on the condition of defendant's mind, and if by reason thereof defendant's mind, at the time of the killing, was incapable of cool reflection, etc." However, that portion of the charge of the court presenting self-defense and abandonment of the difficulty is, we think, subject to the criticisms contained in the motion. The court instructed the jury: "If, however, you find that the defendant fired upon said Levi McGuffey with a pistol, and that the first shot or shots were fired by the defendant in his own self-defense, as self-defense is herein defined to you, but you further find that the said Levi McGuffey abandoned the difficulty, if there was any, and retreated, with no intention of renewing said difficulty, and you further find that there was no actual danger to the defendant at the time such other shots were fired, and that the defendant, viewing the facts from his standpoint, had no reasonable apprehension of danger from the deceased at the time, or that the deceased intended to renew the attack upon him, if any had been made, then the defendant would not be justified in pursuing or firing such other shots after the necessity to fire in self-defense had ceased."

Appellant's criticism of this portion of the charge is that if a charge on abandonment of the difficulty was called for, it should have gone further, and instructed the jury that if defendant, under those conditions, was by the previous conduct of deceased rendered incapable of cool reflection, he would not be guilty of any higher grade of offense than manslaughter. This court held in the case of St. Clair v. The State, 49 Texas Crim. Rep., 479: "The issue of abandonment of the difficulty by deceased was also in the case, and charged upon by the court. This portion of the charge informed the jury that, if deceased abandoned the difficulty, and appellant so understood it, he then fired

upon and killed deceased, he could not plead justification. This is the substance of the charge on the abandonment of the difficulty. This is not sufficient. If appellant was acting on the defensive, and while engaged in the difficulty deceased abandoned the difficulty, and appellant so understood it, and he then shot and killed deceased, he would not be justified. But he might not be guilty of a higher offense than manslaughter. The court did not instruct the jury what would be the law applicable to appellant's case under this condition of things. In our opinion, if the jury should find that defendant was acting on the defensive, and the deceased abandoned the difficulty, and as he was leaving, if the jury should find he was, appellant then shot him, knowing or realizing that deceased had abandoned the difficulty, his offense would not be higher than manslaughter. As the charge is given, it left the jury to ascertain for themselves of what offense appellant would be guilty if he shot after deceased abandoned the difficulty. They gave appellant murder in the second degree. If the law had been charged it might not have been higher than manslaughter."

Appellant also complains that the court erred in presenting self-defense: "If from the evidence you believe the defendant killed the said Levi McGuffey, but further believe that at the time of so doing the deceased had made an attack on him which, from the manner and character of it, and the relative strength of the parties, and the defendant's knowledge of the character and disposition of the deceased, caused him to have a reasonable expectation or fear of death or serious bodily injury, and that acting under such reasonable expectation or fear, the defendant killed the deceased, then you should acquit him."

Appellant's contention is that there is no evidence in regard to "character and disposition of the deceased, or defendant's knowledge of such facts," and that defendant did not claim that deceased made an "attack." The evidence is that when defendant instructed deceased to "get out of there," deceased stepped in the restaurant part of the building and replied, "You son of a bitch, I will make you get out," and threw his hand to his hip pocket. This in law may be an attack, but as ordinarily understood the word "attack" means more than a threatening gesture, and the law should have been applied to the evidence, and the jury instructed that if, by the acts and conduct of deceased, it reasonably appeared to defendant that his life was in danger, he had a right to shoot.

In Rodriguez v. State, 58 Texas Crim. Rep., 397, it is held: "The court's charge on self-defense limited appellant's right on this theory of the facts to an actual attack. If the deceased fired the first shot it was unquestionably an actual attack, and justified this phase of the law. The evidence, however, clearly suggests a case of apparent danger. The Mexican, Mateo Andrado, leaves it in doubt as to who fired first. Tom Armstrong says appellant fired the first shot. Appellant says deceased fired the first shot. The testimony seems to be uncontroverted that the deceased started from the house towards appellant

with his pistol in his hand, and ordered appellant to leave his premises. This raises the question of apparent danger. Deceased had his pistol on appellant on the gallery when he jumped behind Tom Armstrong, and in obedience to the command of deceased was leaving the premises. It appears that on account of the fact that appellant turned to the left to go to the Mexican camp, it angered deceased, and he started in the direction of appellant with his pistol in one hand and a lantern in the other, and that he was talking in a way to the appellant that indicated that he might anticipate serious trouble. The court did not charge on apparent danger."

In bill of exceptions No. 3 it is shown that the prosecuting officer used the following language: " 'Witt is a horse thief, a burglar, a liar and a perjurer. I will not dismiss his case. I will teach him how to wear lies and perjure himself before I get through with him. I would not convict a dog on his testimony.' And in further discussion to the jury, and in reference to the defendant, the county attorney used this language: 'They could have put the defendant's character in issue, to show you whether or not he was a quiet, peaceable and law-abiding citizen, but we could not do that; we could not go into that until they made it an issue. Why did they not do it? Echo says that they knew that they could not prove him to be a quiet and peaceable man, and therefore, being shrewd lawyers, contented themselves to hound and besmirch the character of a dead man, the man that he killed without cause. Isn't it a harsh rule that he has got the right to prove that the deceased was a bad man, and that the dead man did this and that, and we can not prove what the dead man said. It is a rigid rule. Why don't they want the light turned on? Why do they want the light of God Almighty's truth kept from the jury? . . . If ,you are going to listen to this, even the strong arm of the law is paralyzed. You had as well burn up the law books and tear down the courthouses, and leave them all go free. Is it fair? What sort of a man is he, do you know? And yet they could put the dead man's character in issue, and we couldn't. They did not do it, because they knew that if they did then we could, and they knew, I apprehend, that they couldn't prove that his character was bad and we could prove that it was good—that he was a Christian gentleman; and therefore they did not go into it, and we are shut off. They would not put the little daughter of the defendant on, and I apprehend from that that she would testify against him and tell the truth. He 'phoned Mrs. Smith not to send the deceased out there, that they had had some hot words—not insulting to his wife—nothing of that kind. And when I attempted to prove what the deceased went there for they objected—object, and would not let me, it is in his statement—but they would not let me prove it. Then the wife gets on here and testifies. This lady told the officers that she was sick in bed and did not see it. Take the testimony of the deceased just before his spirit went out into the other world, 'He killed me for nothing; I went in there and

he killed me for nothing,' and then take into consideration that we offered to prove that he did not curse and they would not let us—they cut us off,' and 'I offered to prove that he was a member of the church, a Christian gentleman, and they cut me off.' "

In bill No. 2, it is shown that in his argument the following language was used: " 'Gentlemen of the jury: If the State had been permitted it would have proved that the deceased stated in his dying declaration, 'I went back to the restaurant on the day of the homicide for the purpose of telling Johnson that we would have no trouble,' and quoted to the jury part of the dying declaration which had, by the court, been excluded from the record, the same being, 'I aimed to tell him we would have no trouble,' and further, in his argument and quotation of the evidence to the jury, the said attorney, in further discussion of the argument in relation to the dying declaration, with reference to what the deceased said about the defendant shooting him as he made his exit from the defendant's place of business, quoting, 'and if you will look at the screen door you will see a bullet hole; it hit me in the side, and that is what is killing me.' The latter part of this evidence had been by the court excluded from the record, on objection by the appellant." Counsel should never testify in their argument, and especially should they not tell the jury what the evidence would have been had the court permitted them to introduce certain testimony. In their remarks they should always keep themselves in the record, and it would hardly occur "that the law books will be torn up and the courthouse torn down" if they should occasionally have returned a verdict not entirely to their satisfaction. Such language should not have been used.

In another bill it is complained that the State's attorney was permitted to cross-examine defendant's wife on matters not inquired about in her examination in chief. This bill is in such shape that we can not intelligently pass on this matter, but as this case will be reversed on other matters, we will say that on another trial the cross-examination of defendant's wife, if she is placed on the stand, should be limited to those matters about which she testifies in her direct examination.

There are other matters complained of in the motion, but we do not deem it necessary to discuss them. Reversed and remanded.

*Reversed and remanded.*