GEORGE ZIMMERMAN v. THE STATE.

No. 4952. Decided March 12, 1919.

Rehearing denied October 15, 1919.

1.—Murder—Self-Defense—Charge of Court—Rquested Charge.

Where, upon trial of murder, the court submitted a proper charge on self-defense, and in addition thereto a requested charge instructing the jury, under the facts of the case, that if they believed from the evidence that the deceased came upon the defendant in an angry or threatening manner stating that he would make him take down the fence which he accused the defendant of putting up, and that such act and conduct of the deceased produced in the mind of the defendant a reasonable apprehension of fear of death or serious bodily injury, viewed from the defendant's standpoint alone and that the defendant thereupon shot and killed the deceased, his right of self-defense would be complete, and they should acquit the defendant, the same was sufficient and there was no reversible error.

2.—Same—Self-Defense—Charge of Court—Epilepsy—Requested Charges.

Where, upon trial of murder, the defendant pleaded self-defense and insanity from epilepsy, and the court gave a proper charge on self-defense, and in addition thereto submitted a requested charge on self-defense which was an admirable presentation of the law as applied to all the facts concisely stated therein, and upon which any claim of self-defense by defendant might be predicated, there was no error in refusing special charges that the jury could take into consideration the weakened condition of defendant's mind in deciding whether to him the danger was real or apparent, which may have resulted from epilepsey or excitement.

4.—Same—Manslaughter—Charge of Court—Person of Ordinary Temper

Where the court's charge on manslaughter, defined adequate cause as such as would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper sufficient to render the mind incapable of cool reflection, the contention of defendant that as the evidence showed defendant to be subject to epileptic fits, it would take less to arouse within him such passion and that a different test should have been submitted, was untenable; besides, no special charges were requested, and taking the court's additional charge in consideration that all the facts and circumstances in

evidence should be considered in connection with the passion aroused in defendant's mind, there was no reversible error.

#### 4.—Same—Statutes Construed—Adequate Cause—Charge of Court—Words and Phrases.

Article 1130 P. C., defines adequate cause as such as would commonly produce a degree of anger, etc., in a person of ordinary temper, etc., and the court is not justified in going beyond the statutory definition which uses the words, "person of ordinary temper;" besides the latter part of the court's charge on manslaughter authorized the jury to take into consideration all the facts and circumstances in evidence.

#### 5.—Same—Insanity—Charge of Court—Reasonable Doubt.

Where, upon trial of murder, the defendant pleaded insanity besides self-defense, and the court instructed the jury that insanity must be clearly proved by the defendant that he was insane, but that it was not necessary that it be proved beyond a reasonable doubt, there was no reversible error. Following Wilson v. State, 58 Texas Crim. Rep., 596, and other cases.

#### 6.—Same—Argument of Counsel—Practice in District Court.

Where the argument of State's counsel was in response to certain argument and language used by counsel for defendant and the statements objected to were but conclusions of State's counsel combating conclusions reached by counsel for defendant, and the court both orally and in writing instructed the jury not to consider anything said by counsel for the State outside of the record, there was no reversible error.

#### 7.—Same—Sufficiency of the Evidence—Self-Defense—Insanity.

Where, upon trial of murder, and a conviction for that offense, the record showed on appeal that defendant's pleas of insanity and self-defense were not sustained by the evidence, there was no reversible error.

#### 8.—Same—Charge of Court—Insanity—Epileptic Fits—Rule Stated.

The fact that defendant may have been subject to epeleptic attacks, would not change the rule adhered to by this court, requiring one accused of crime to satisfy the mind of the jury that at the very time of the commission thereof, his mind was in such condition that he did not know the nature and quality of his act; that it was an act that he ought not to do; or if he knew it was wrong that he did not have sufficient will power to refrain from doing the same, and under the evidence of the case and the charge of the court there was no reversible error.

#### 9.—Same—Question of Fact—Function of Jury—Insanity—Epilepsy.

The evidence on the plea of insanity is entirely for the jury whose function is to decide the same, and this court is unable to see that a different rule should be laid down for epileptic insanity from that of insanity of any other character, as there are no degrees of insanity, and the one test is the knowledge of right from wrong of the particular act and the ability to refrain therefrom. Following Kirby v. State, 68 Texas Crim. Rep., 63; besides, the tral court gave a special charge to the jury covering the facts of the case if they believed that defendant was suffering from epilepsy just prior to the homicide, etc., to acquit him.

#### 10.—Same—Standpoint of Defendant—Actual and Apparent Attack—Charge of Court.

Where the court's charge on self-defense, considered as a whole, in more than one place instructed the jury that they must view the matter

from the standpoint of the defendant alone, and the evidence showed that if there was any attack it was actual and not threatened, and if there was any danger it was real and not apparent, there was no reversible error.

Appeal from the District Court of Travis. Tried below before the Hon. James R. Hamilton, judge.

Appeal from a conviction of murder; penalty, eight years imprisonment in the penitentiary.

The opinion states the case.

*White, Cartledge & Wilcox,* and *Chas. L. Black,* for appellant.— On question of actual and apparent attack: Stewart v. State, 51 S. W. Rep., 907; Seeley v. State, 63 id., 309; Brady v. State, 65 id., 521; Benson v. State, 51 Texas Crim. Rep., 367, 103 S. W. Rep., 911; Duke v. State, 61 Texas Crim. Rep., 19, 133 S. W. Rep., 432; Lyons v. State, 71 Texas Crim. Rep., 189, 159 S. W. Rep., 1070; Andrus v. State, 73 Texas Crim. Rep., 329, 165 S. W. Rep., 190; Nix v. State, 74 S. W. Rep., 764; Bennett v. State, 194 S. W. Rep., 148; Swain v. State, 86 S. W. Rep., 335; Adams v. State, 84 S. W. Rep., 231; Castro v. State, 66 Texas Crim. Rep., 282, 146 S. W. Rep., 553; Harris v. State, 55 Texas Crim. Rep., 469, 117 S. W. Rep., 839.

On question or argument of counsel: Smith v. State, 55 Texas Crim. Rep., 563; McKinley v. State, 52 id., 182; Smith v. State, 44 id., 137; Johnson v. State, 66 Texas Crim. Rep., 586, 148 S. W. Rep., 328; Wilson v. State, 81 Texas Crim. Rep., 216, 194 S. W. Rep., 828; Weige v. State, 81 Texas Crim. Rep., 476, 196 S. W. Rep., 524; Brailaford v. State, 71 Texas Crim. Rep., 113, 158 S. W. Rep., 541; Taylor v. State, 50 Texas Crim. Rep., 362.

On question of epileptic insanity: Persons v. State, 60 Am. Rep., 193; Hurst v. State, 50 S. W. Rep., 719; McCulloch v. State, 94 S. W. Rep., 1056; Stanfield v. State, 94 S. W. Rep., 1057.

*E. B. Hendricks,* Assistant Attorney General, for the State.—On question of argument of counsel: King v. State, 32 Texas Crim. Rep., 463; Mathews v. State, 32 Texas Crim. Rep., 355; Love v. State, 35 id., 27; Alexander v. State, 40 id., 395; Leech v. State, 63 id., 339; Maxwell v. State, 69 Texas Crim. Rep., 248, 153 S. W. Rep., 324; Himmelfarb v. State, 76 Texas Crim. Rep., 173, 174 S. W. Rep., 586.

On question of insanity: Mitchell v. State, 52 Texas Crim. Rep., 37; Coffey v. State, 60 id., 73; Cox v. State, 60 id., 471; Woods v. State, 67 Texas Crim. Rep., 569, 150 S. W. Rep., 633; Douglass v. State, 73 Texas Crim. Rep., 385, 165 S. W. Rep., 933.

LATTIMORE, Judge.—In this case appellant was convicted in the Criminal District Court of Travis County for the offense of

murder and his punishment fixed at eight years in the penitentiary.

It will be necessary, in order to understand the opinion, to state substantially the facts in the case. Appellant and deceased lived only about two hundred and fifty yards apart, one on the north and the other on the south side of a public road of which deceased was overseer. Because of a bad culvert in said road, the deceased had let down his fence made of woven wire, laying some rocks on the same, and thus made a gap through which the users of said road might go across his land and avoid the defective culvert. The record discloses no ill-will between appellant and deceased prior to the day of the difficulty. On that morning deceased had called appellant over the telephone and told him his stock was in the pasture of deceased and he wished them taken out as there was very little grass which he needed for himself. Deceased was heard to say in the 'phone during the conversation with appellant, "Well, you know it is not up." A little later the wife of deceased saw appellant driving his stock out at the place where the fence was down and also saw him put the fence up so that the traffic could not pass through. She said she saw appellant stoop down and throw the rock off the fence and raise the wire up, and that she called the attention of deceased to this and he expressed surprise and came and stood by her looking at appellant, and then suggested that he go down and see what appellant had done, saying: "I wonder what he is doing that for, I believe I will go down and see what he is doing." Deceased then went down to the gap and after looking at it for a moment walked on up to the house of appellant. The wife of deceased said that he was not angry at that time and denied having said to Mrs. Zimmerman that he was; also denied stating to Mrs. Fox that he was angry at said time, in which statement she was corroborated by Mrs. Fox when on the stand.

It is uncontroverted that deceased was not armed when he went to appellant's house and that the appellant was on his porch when the deceased reached his gate, and that the deceased was shot twice, once in the upper part of the chest and once in the arm; also it is uncontroverted that appellant fired all the cartridges in his pistol, about six in number.

A sharp conflict appears between the evidence of the wife, son and daughter of deceased, testifying for th State, and that of the daughter of the appellant, corroborated to some extent by her mother, testifying for the appellant; said conflict being as to whether the shooting by appellant began while deceased was outside the gate and doing nothing, appellant advancing to where deceased was and shooting him again after he had fallen; or whether deceased at the gate threatened appellant and started to him up the walk and was there met by appellant and the shooting took place.

We reproduce substantially all of what each of said last named witnesses testified. The first three for the State stated with substan-

tial accord that they witnessed the whole of the fatal difficulty; that appellant was sitting on the porch of his home and deceased walked up to the front gate of appellant's yard, which was about twenty or twenty-five feet from the edge of the porch and that appellant sprang up and started toward the deceased, firing at him with a pistol, once from the porch and the other shots as he advanced to where deceased fell just inside or partly inside the gate. For the appellant, his wife swore that she was sitting in her room and did not see deceased as he approached the house, but heard him ask the appellant if he put that gap up and heard appellant say no, and that she then heard the word rock, and nothing more as she was engaged in her work, till she heard the pistol. She then ran further back in the house where her son was asleep and waked him. She says the feet of deceased were five or six feet from the gate as his body lay there after he was shot.

Appellant's daughter swore that she was lying on her bed and heard foot-steps, raised up and looked through the window and saw deceased who was outside the gate; that he walked to the gate and she noticed him, and noticed that he was very angry; that he was pale and trembling all over. She said that when deceased got to the gate he spoke, saying: "Did you put that gap up?;" that her father's voice answered, "No;" that she could not see her father at that time though by his voice she located him on the front porch; that deceased said: "You didn't move the rock off the wire?" that her father said: "I may have kicked one off;" that deceased replied: "I know you did and I am going to make you put it up," and that he started through the gate as fast as he could have possibly gone; that when deceased was about two-thirds of the way to the house her father met him and she heard a shot fired; that the men were not more than two or three inches apart at that time; that they clinched and she ran to the telephone and tried to call up the sheriff; that the men kept fighting back toward the gate and over east of the walk, and she kept trying to 'phone for the sheriff but central did not know his number and she went toward the door and saw her father shoot deceased who then fell, and her father came on into the house; that she ran out in the yard and in a few minutes deceased died. On cross-examination, this witness said that all that was said by deceased was spoken by him outside the gate, and that as soon as her father spoke she could locate him on the front porch but could not see him and did not see him until deceased had gotten about half way from the gate to the porch. She was asked if she did not have a conversation with sheriff Matthews who came to the scene in a short time, and she said that she did, but further denied telling him that deceased came to the gate and asked her father if he took the rock off the fence and that her father immediately began shooting at him. She also denied telling Mrs. Fox the same morning of the killing, that she was in the back and did not see any part of it.

Sheriff Matthews swore that on the morning of the killing he reached the place in a very short time and that he talked to the daughter of appellant, and that she stated to him that deceased asked her father if he took the rock off the fence, and when he said that her father jumped up off the gallery and went to shooting at him. Mr. Matthews also said he asked her if her father went into the house after his pistol, after deceased came up and that she said that he did not go back into the house at all, that when deceased asked him that appellant was sitting on the front gallery and commenced shooting and advancing toward deceased. Mrs. Fox also testified that on the morning of the killing the daughter of appellant told her that she was in the back and did not see any part of the killing.

Appellant defended on the grounds of insanity and self-defense; and also contends before this court that the law as to each of said defenses, as well as that of manslaughter was erroneously charged to the jury. We have given the case careful scrutiny, examining the able brief of counsel for the appellant as well as the entire record. The court charged in the seventh and eight paragraphs as follows:

"A reasonable apprehension of death or great bodily harm will excuse a party in using all necessary force to protect his life or person, and it is not necessary that there should be actual danger, provided he acted upon a reasonable apprehension of danger as it appeared to him from his standpoint at the time, and in such case the party acting under such real or apparent danger is in no event bound to retreat in order to avoid the necessity of killing his assailant.

"Now, if from the evidence you believe the defendant killed the said A. E. Lawrence, but further believe that at the time of so doing the deceased had made an attack on the defendant, which from the manner and character of it and the relative strength of the parties, caused the defendant to have a reasonable expectation or fear of death or serious bodily injury, and that acting under such reasonable expectation or fear, the defendant killed the deceased. then you should acquit the defendant.

"8th, Now, if you believe from the evidence, beyond a reasonable doubt, that the defendant, George Zimmerman, in the County of Travis and State of Texas, on or about the time alleged in the indictment, with a gun or pistol, and not in defense of himself against an unlawful attack, real or apparent, reasonably producing a rational fear or expectation of death or serious bodily injury, and not under circumstances which would reduce the offense to the grade of manslaughter, with intent to kill did unlawfully and with malice aforethought, shoot with a gun or pistol and thereby kill the said A. E. Lawrence, as charged in the indictment, you will find the defendant guilty of murder as charged and assess his punishment at death or by confinement in the penitentiary for life, or for any term of years not less than five."

And also gave at appellant's request special charge No. 8, which is as follows:

"If you believe from the evidence that the deceased came upon the defendant in an angry or threatening manner stating that he would make him take down the fence which he accused the defendant of putting up, and that such act and conduct of the deceased produced in the mind of the defendant a reasonable apprehension of fear of death or serious bodily injury, viewed from the defendant's standpoint alone, and that the defendant thereupon shot and killed the deceased, his right of self-defense would be complete, and you will return a verdict of not guilty."

We are of opinion that the charges above quoted fairly presented to the jury the law of the case as to apparent danger and the right of the appellant to have the jury view the case from his standpoint in determining whether he acted in his own self-defense. The special charge quoted is an admirable presentation of the law as applied to all the facts concisely stated therein, and upon which any claim of self-defense by appellant might be predicated. The jury are told in said special charge to acquit if the deceased came up on appellant in an angry and threatening manner (as testified to by the daughter) stating that he would make him take down the fence which he accused the appellant of putting up (as testified to by the daughter, these being the only acts of deceased testified to by any one). Also that if a reasonable apprehension of death or serious bodily injury was by such act and conduct of deceased (no matter whether the same made the danger real or only apparent), produced in the mind of the defendant (no matter whether his mind was normal or abnormal), and that in determining whether such acts and conduct did raise in appellant's mind such apprehension, the matter should be viewed alone from appellant's standpoint.

We can see no phase of the case on self-defense not comprehended and clearly stated in this charge which so fully rounded out the main charge of the court on this issue as to make superfluous and confusing any other special charges on these questions. Said special charge boldly outlines appellant's whole case, save and except the question of insanity. There was in the case no question of weapons or previous threats or difficulties or hair-splitting technicalities, over provoked difficulties. There was only the naked proposition, clearly put in said special charge of the two things depended upon by appellant for justification, to-wit: the language and advance of deceased, and on the other hand the complete right of one situated as appellant was to have the matter looked at from his standpoint, and therefrom determine whether said language and advance produced in his mind the belief that he was about to be injured or killed, and that if this caused him to shoot and kill, the jury should acquit.

There was no need for special charges telling the jury that they could take into consideration the weakened condition of appellant's

mind in deciding whether to him the danger was real or apparent. Whatever his mental condition may have been, it was before the jury; whether it resulted from epilepsy or excitement and the jury were plainly told that if the things done by deceased were enough to make in the mind of the appellant apprehended danger of injury or death, and that so apprehending he shot and killed, he would not be guilty.

Complaint is also made of the court's charge on manslaughter, in that defining adequate cause the court's language was: "Such as would commonly produce a degree of anger, rage, resentment or terror in a person of ordinary temper sufficient to render the mind incapable of cool reflection," it being contended by appellant that as the evidence showed him to be subject to epileptic fits and therefore nervous and irritable that it would take less to arouse within him that degree of anger, rage, resentment, etc., which would reduce unlawful killing to manslaughter, then it would in a person of ordinary temper, and that therefore a different test should have been submitted. No special charge submitting any other definition was offered on the trial by appellant, and our attention is not here called to any authority holding proper any other than the one given by the court. Special charge No. 7 asked by appellant and refused instructs the jury to acquit if they believed appellant's mind incapable of cool reflection, and that he killed deceased in a sudden passion, and that such state of mind was caused by deceased. This charge had reference, and could have reference only to the defense of insanity and not manslaughter.

The law makers have seen fit to define adequate cause as follows:

"By the expression 'adequate cause' is meant such as would commonly produce a degree of anger, rage, resentment or terror in a person of ordinary temper sufficient to render the mind incapable of cool reflection." (Art. 1130, P. C.)

We are not the writers of the law nor do we believe we would be justified in going beyond the statutory definition which uses the words, "person of ordinary temper." Our merciful law concedes to one rendered incapable of cool reflection by anything which would produce such condition of mind in any person of ordinary temper, a less punishment for a homicide than would be otherwise inflicted, but the statutory definition is as far as we feel justified in going. However, the latter part of the court's charge on manslaughter is as follows:

"Although the law provides that the provocation causing the sudden passion must arise at the time of the killing, it is your duty in determining the adequacy of the provocation (if any), to consider in connection there with, all the facts and circumstances in evidence in the case, and if you find that, by reason thereof, the defendant's mind at the time of the killing was incapable of cool reflection, and that said facts and circumstances were sufficient to pro-

duce such state of mind, in a person of ordinary temper, then the proof as to the sufficiency of the provocation satisfies the requirements of the law, and so in this case you will consider all the facts and circumstances in evidence in determining the condition of the defendant's mind at the time of the alleged killing, and the adequacy of the cause (if any) producing such condition."

If the courts should attempt to substitute judge-made law for that written in the statutes we should soon be wholly at sea as to standards of temper and disposition in such cases, and same could easily be changed with every change in the personel of the courts. We think adventures and speculations in such matters and as to such standards unwise, and hold the court's definition sufficient.

It is also contended by appellant that the court below erred in instructing the jury that to establish a defense on the ground of insanity it must be clearly proved, etc., that appellant was insane. It will be noted that the court also charged that it was not necessary that insanity be proven beyond a reasonable doubt. This question raised by appellant has often been before the courts and held adversely to his contention. Giebel v. State, 28 Texas Crim. App., 151; Carlisle v. State, 56 S. W. Rep., 365; Wilson v. State, 58 Texas Crim. Rep., 596; McCullough v. State, 50 Texas Crim. Rep., 132; Stanfield v. State, 50 Texas Crim. Rep., 69.

The only bill of exceptions shown in the record is taken to the argument of the district attorney in closing the case for the State. This has received our careful consideration and the language used appears to be wholly in response to certain arguments and language used by counsel for appellant which are throughout referred to in the remarks attributed to State's counsel. No facts outside the record were stated. No personal abuse was indulged in and the statements objected to were but conclusions of the State's attorney, combatting conclusions reached by counsel for the appellant. The court, both orally and in writing, instructed the jury not to consider anything said by counsel for the State outside of the record. As the same appears before us we see therein no reversible error.

There were two physicians and appellant's wife who testified they believed him insane; many of his neighbors who had known him for a long time and testified to seeing him constantly, bore witness that in their judgment he was sane. No act or statement of his at any time is before us seriously indicating insanity, unless the killing of deceased may be so considered, except the fact that he was subject to epilepsy as testified to by the doctors and the wife and daughter. The daughter had seen him have one epileptic fit; the son was not asked about this at all, nor was a nephew who is an attorney; nor had any of the neighbors seen him have such attacks though some of them said they had heard of it. The daughter was practically the only witness whose testimony controverted that of the State as to the facts immediately surrounding the killing, and she was im-

peached by Sheriff Matthews and Mrs. Fox, to the one of whom she made a statement the morming of the homicide entirely corroborative of that made by the wife, daughter and son of deceased; and to the other of whom she said that she was in the back and did not see the killing at all. The proof shows that after having been requested by deceased to take his stock out of the pasture, appellant not only did so but removed the rock placed by deceased on his own fence to hold it down and thereby make a gap for the use of the public. By this act appellant closed the gap in deceased's fence, and he then went home and with his pistol in his possession placed himself on the porch from which he, a few moments later, shot and killed deceased who apparently came to inquire of him why he had taken the rock from the fence and closed the gap. From the record before us, as we read it, it appears that appellant has had a fair trial and that no reversible error is shown.

The judgment of the lower court is affirmed.

*Affirmed.*

### ON REHEARING.

### October 15, 1919.

LATTIMORE, JUDGE.—This case is before the Court upon appellant's motion for a rehearing, and in view of the able and exhaustive presentation of the questions raised, we have carefully gone through the entire record and our original opinion, but find ourselves unable to come to any different conclusion from that which the original opinion announced.

The fact that appellant may have unquestionably been subject to epileptic attacks, would not change the rule adhered to by the announced decisions of this Court, requiring one accused of crime to satisfy the minds of the jury that at the very time of the commission thereof, his mind was in such condition that he did not know the nature and quality of the act; that it was an act that he ought not to do; or if he knew it was wrong, that he had not sufficient will-power to refrain from doing the same.

Referring to the record before us bearing upon the condition of appellant's mind at the time of the homicide, we find that no witness testified that at said time appellant was suffering from an epileptic fit, or giving any of the usual or recognized symptoms of what might be termed an attack of epilepsy. He was not in an epileptic condition shortly before the homicide, and it is to be observed that of the number of people who saw him directly afterwards, no one testified to a word, look, or action indicating to such person an epileptic condition, or which, upon being submitted to experts, was pronounced by them a symptom of epilepsy.

Deceased was shot by a pistol by appellant, and after the pistol had been emptied of its six shells, appellant gave it to his son, and further armed himself with a shotgun. The wife of deceased, who hurried from her home, some 250 yards distant, immediately after the killing, and after she had armed herself with a gun, said without contradiction, when she got out into the road, appellant was standing inside of his lot and had his gun levelled on her, and said: "You go back and put that gun down or I will kill you." She testified that she then said: "You have killed my husband, and I must kill you," and that appellant then said: "You put that gun down."

Sheriff Matthews, who reached the scene of the homicide shortly after its occurrence, stated that when he got there, there was a crowd in the house, and that appellant was in the backyard with a shotgun.

We have again referred to these facts immediately attendant upon the homicide and bearing upon the mental condition of the appellant, because the question of sanity *vel non*, is one for the jury, and they have decided it in this case adversely to the appellant. It is true that two reputable physicians testified upon hypothetical statements, and gave their opinions as to the fact that the matters, stated, in their judgment, evidenced an abnormal condition of the mind. Dr. Goodall Wooten testified that he had seen appellant only one time—in 1916, and not at all during 1917; and Dr. Joe Wooten stated that he had seen him only a very few times since 1907; and further, that in his opinion, except when in an epileptic fit, or laboring under the epilepsy itself, the appellant was sane. The weight of all this character of evidence is entirely for the jury, and we are unable to see that a different rule should be laid down for epileptic insanity from that of insanity of any other character. In the Kirby case, 68 Texas Crim. Rep., 63, we held that there are no degrees of insanity, the one test being the knowledge of right from wrong of the particular act and the ability to refrain therefrom. However, we observe that in the instant case, in addition to the matters quoted in our original opinion, the trial court gave a special charge to the jury, telling them that if they believed that appellant was suffering from epilepsy, and that just prior to the homicide, deceased did some act, or spoke some word which caused the mind of appellant, by reason of said disease, to be dethroned to such an extent as that he did not know the nature or quality of the act he was doing, or did not know it was wrong, they should acquit him on the ground of insanity.

We regret that we are unable to agree with appellant that the argument of the district attorney was not within the record, and not in reply to arguments of appellant's attorney.

We also substantially repeat that we think the charge as given by the trial court, was a clear presentation of the law applicable

to the facts. Charges of trial courts must be considered as a whole, and juries regarded as reasonable men, desirous of following the instructions of the court in deciding cases according to their best judgment, on their merits. In more than one place in this charge, the jury were told that they must view the matter from the standpoint of the appellant alone, and decide whether or not the words, acts, or conduct of the deceased produced in his mind a reasonable fear of death or serious bodily injury, and that if . such a condition did exist in his mind, that his right of self-defense was complete and he should be acquitted. If there was any attack at all it was actual and not threatened, and if there was any danger evidenced it was real and not apparent.

Believing the original opinion correct, the motion for rehearing is overruled.

*Overruled.*