Troy McCARTNEY, Appellant,

v.

The STATE of Texas, Appellee.

No. 51565.

Court of Criminal Appeals of Texas.

Oct. 20, 1976.

Sheehan & Dubuque, on appeal only, Dumas, for appellant.

Andy Shuval, Sp. Pros., Hereford, Jim D. Vollers, State's Atty., David S. McAngus, Asst. State's Atty., Austin, for the State.

OPINION

ONION, Presiding Judge.

This appeal is taken from a murder conviction, wherein the jury assessed punishment at fifty (50) years' confinement in the Department of Corrections.

Appellant urges that the trial court erred in refusing to instruct the jury on the lesser included offense of voluntary manslaughter, and complains there was jury misconduct because of an improper discussion of the parole laws.

The State's evidence at the guilt stage of the trial reflects that the appellant McCartney and the deceased, Ruby Mae Duckworth, had been living together "for some time,"[1] and two weeks before the killing the deceased moved into a hotel and separated from the appellant. There was testimony she was going with a Melvin Blair after the separation. Earlier in the afternoon of May 15, 1974, the date of the shooting, between 2 and 3 p. m., the evidence reflects that the appellant purchased the .22 calibre pistol with which he subsequently shot the deceased. The owner of the shop who sold the pistol to the appellant testified he appeared to be cool and collected and did not seem nervous or disturbed.

Alfred Combs testified that he first saw the appellant about noon on May 15th, when the appellant sold him an air conditioner for $100.00. At such time appellant did not seem upset or distraught. Combs testified he saw the appellant later in the afternoon in Harry's Bar in Dalhart. Combs was seated in booth # 2 with Ellie Fanelli when the appellant came in and sat in booth # 1. Fanelli spoke to him, and the appellant said "he was waiting on some broad," who Combs said had reference to the deceased, Ruby Mae Duckworth. At this point, Fanelli called his attention to the fact the deceased was seated in booth # 3.

Appellant joined the deceased in her booth and Combs heard them "fussing a little." The deceased stated, "I don't have to listen to you, you SOB," and them moved to a bar stool, and the appellant followed her and the "fussing" continued until the bartender told them they had to leave if it continued. The deceased tapped the appellant on the arm, then moved back to a booth. Combs related the appellant remained at the bar for about five minutes, then went to the restroom. A little later, Combs heard a shot and looked up and saw the appellant pointing a pistol at the deceased. There was a second shot, and then Combs rushed to the appellant, got him on the floor and took the pistol away from him. Combs related the deceased just fell over in the booth and appeared to be dead.

Ruby Losacco, bartender at Harry's Bar, testified she saw the appellant go to the deceased's booth and heard the appellant tell the deceased he was going to kill her, and the deceased replied, "No, you're not." The witness told the appellant to leave the deceased alone and called him aside and told him, "She (deceased) belongs to another man."[2] The appellant replied, "Well, she has belonged to me for a long time." Appellant then returned to the deceased and again threatened to shoot her. The witness offered to call the police, but the deceased declined the offer stating, "He is not going to do it." The appellant stated, "Just step outside . . . I will shoot you . . . I know right where to put it," and the deceased said, "Well, I'm going to tell another thing, when I do I'm going to tell them about you forging my name to my withholding return." The witness told the deceased to go to a booth and she would see that the appellant did not follow her. While it is not altogether clear from the record in what order the events then occurred, it appears that when the deceased

---

1. The appellant did not testify at the guilt stage of the trial. At the penalty stage he testified he was 50 years old and had never been married. He related that on September 3, 1973, the deceased knocked on his door, that he had known her as a neighbor a year previous to that and she and her husband had separated. She told him she was hungry and he let her come in. He related that after that they started living together.

2. The witness Losacco explained later she meant Duckworth, the deceased's husband.

went to a booth a Cecil Jobe asked her, "Would Melvin care if I spent three nights with you?" and she answered, "No, I guess not, he never has." The witness Losacco admonished Jobe that the appellant was not Melvin and not to agitate him. At this time a Warren Jennings stated, "Well, I will sit with you, sweetheart," and went to the booth where the deceased was. At this point the appellant said, "You might as well take the whole bar with you," and then laughed. He then went to the restroom. Jennings sat with the deceased for a short time and then went to the restroom as the appellant was coming out of the restroom. Losacco watched him and decided nothing was going to happen and started washing glasses when she heard a shot and then a second, and then rushed to help Combs disarm the appellant.

The cause of death was shown to be a gunshot wound to the chest.

Ellie Fanelli testified for the defense that she thought the deceased was "rather a flirtatious woman," that the deceased had told her she had been living with the appellant, but shortly before the shooting she had seen the deceased with a Melvin Blair.

Edna Dooley testified she ran a cafe and that the appellant had worked for her as a back-up cook and as a dishwasher and he was not a man of violence.

The appellant did not testify at the guilt stage of the trial.

■ Appellant initially contends that the court erred in failing to charge on voluntary manslaughter even if the issue was not raised by the evidence. Appellant notes that Article 1257c, Vernon's Ann.P.C., 1925, related to instructions on the issue of murder without malice and provided that in cases "where the facts present the issue of murder without malice" the jury was to be instructed thereon "and in appropriate terms in the charge to apply the law to the facts as developed from the evidence." He argues that this Article has now been repealed and that neither V.T.C.A., Penal Code, § 19.02 (murder) nor § 19.04 (Voluntary Manslaughter) make any similar provi-

sion requiring the issue of voluntary manslaughter to be submitted if raised by the evidence. He reasons that the Legislature by expressly excluding such procedural requirement in the definition of murder or voluntary manslaughter meant the issue of voluntary manslaughter must be submitted in any murder case where requested even if the issue is not raised by the evidence. We reject outright any such contention. We find nothing in appellant's argument to support the fact that the legislative intent was what he claimed it to be.

Appellant next argues that, even if the issue must be raised by the evidence before it need be submitted to the jury, it was in fact raised by the evidence in the instant case.

V.T.C.A., Penal Code, § 19.04 (Voluntary Manslaughter), provides:

"(a) A person commits an offense if he causes the death of an individual under circumstances that would constitute murder under Section 19.02 of this code, except that he caused the death under the immediate influence of sudden passion arising from an adequate cause.

"(b) 'Sudden passion' means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation.

"(c) 'Adequate cause' means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.

"(d) An offense under this section is a felony of the second degree."

It is noted that the term "adequate cause" was brought forward from former Article 1257c, supra, and that "sudden passion," undefined in the former statute, is now statutorily defined following the general trend of the case law. See 2 Branch's Ann.P.C., 3rd Ed., § 19.04 (Explanatory Comment), p. 21.

As a result of its historical background, the Practice Commentary to V.T.C.A., Pe-

nal Code, § 19.05, is pertinent since it also deals with said § 19.04.

The commentary reads in part:

"Sections 19.04 and 19.05 restore manslaughter to the Texas criminal homicide lexicon. Before 1927 Penal Code arts. 1244 to 1255 defined manslaughter substantially in terms of the common law's voluntary manslaughter, i. e., an unlawful, willful killing on legal provocation. Common-law involuntary manslaughter, an unlawful negligent killing, was preserved in substance in arts. 1230 to 1243 (negligent homicide). The 1927 Murder Act repealed arts. 1244 to 1255, replacing voluntary manslaughter with the concept of murder without malice, art. 1257c, but the negligent homicide articles, 1230 to 1243, were expressly saved from repeal.

"Sections 19.04 and 19.05 are an interesting blend of the old and new. Section 19.04 is basically the 1856 definition of (voluntary) manslaughter, without, however, that first code's enumeration of what was and was not adequate cause. See Penal Code arts. 594 to 597 (1856). As noted, these articles became 1244 to 1246 in the 1925 code but were repealed in 1927. The analogue to common-law involuntary manslaughter is preserved in Section 19.05, but its immediate ancestor is neither the common law nor its Texas offspring but the Model Penal Code. Section 19.05(a)(2) traces its lineage both to the common law (the misdemeanor-manslaughter doctrine) and to the modern legislative judgment that driving while intoxicated is recklessness per se.

"A killing that otherwise would be murder is reduced to voluntary manslaughter under Section 19.04 if it occurred while the actor was under the 'immediate influence' of a 'sudden passion' arising from 'adequate cause.' The quoted words were all lifted from art. 594 of the 1856 code (art. 1244 of the 1925 code) and all were brought forward into prior art. 1257c to define murder without malice as part of the 1927 Murder Act. 'Immediate influence' appears redundant with the general cause-and-effect re-quirement and with Subsection (b)'s requirement that the passion arise at the time of the offense; this may explain why the courts have rarely discussed it. 'Sudden passion' and 'adequate cause' have been the subject of judicial interpretation since the 1856 code took effect, however.

"It was clear that sudden passion could be produced by conduct other than the victim's, the court in *Garcia v. State* [70 Tex.Cr.R. 485], 156 S.W. 939 (Cr.App. 1913), for example, holding that the provocation of one acting together with the victim qualified as legal provocation. Subsection (b) incorporates this and similar holdings with the phrase 'another acting with the person killed.'

"The time element of the sudden passion definition has produced the most appellate litigation because it purportedly limits the time span to the time of the offense. Texas courts wasted no time in modifying the definition's literal language, however, with the statement below representing a typical example.

"We are aware that our statute says that the provocation must arise at the time of the homicide, and must not be the result of a former provocation; yet, in our opinion, the statute evidently includes such provocation as constitutes a part of the res gestae, or is so near in point of time to the homicide as to allow the mind of a person of ordinary temper, which has become excited by some previous provocation, to become cool and composed before the act of killing. What is sufficient cooling time is a matter of fact, and must be judged by the circumstances attending each particular case. The time in which the mind of an ordinary man, under like circumstances, would have cooled, is a reasonable time. But in every proper case this matter should be submitted by the court to the jury in appropriate instructions. . . .

*Thomas v. State* [42 Tex.Cr.R. 386], 56 S.W. 70, 71 (Cr.App.1900). See also *Miles v. State,* 18 Ct.App. 156, 170 (1885).

"Long before the enactment of Penal Code art. 1257a (now Section 19.06), the courts allowed in evidence everything relevant to the actor's state of mind and the Court of Criminal Appeals regularly found fault with jury charges limiting consideration solely to provocation at the time of killing, see, e. g., *Johnson v. State* [63 Tex.Cr.R. 50], 138 S.W. 1021 (Cr.App. 1911) (nearly two weeks between first and fatal provocation); *Mundine v. State* [37 Tex.Cr.R. 5], 38 S.W. 619 (Cr.App. 1897) (overnight). On the other hand, if the 'former provocation' did not in fact provoke the killing, it was not charged but was nevertheless admissible in evidence, e. g., *Bell v. State* [85 Tex.Cr.R. 475], 213 S.W. 647 (Cr.App.1919); *Rodgers v. State* [85 Tex.Cr.R. 338], 212 S.W. 166 (Cr.App.1919); *Willis v. State* [74 Tex.Cr.R. 16], 166 S.W. 1172 (Cr.App. 1914). (See also the commentary on Section 19.06 for discussion of the evidence issue.)

"As noted the former manslaughter articles partially enumerated what was and was not adequate cause as a matter of law, e. g., fighting words alone were not unless they insulted a female (arts. 1247, 1248), assault causing pain or bloodshed was (art. 1248). After the 1927 Murder Act repealed these articles, the courts held that a jury charge on adequate cause was limited to the statutory definition in prior art. 1257c, *Hettich v. State* [130 Tex.Cr.R. 580], 95 S.W.2d 113 (Cr.App. 1936); *Mosely [Mosley] v. State* [149 Tex. Cr.R. 523], 196 S.W.2d 822 (Cr.App.1946) (identifying causes as adequate or inadequate in charge would constitute comment on weight of evidence).

"The definition of adequate cause in Section 19.04(c) is both objective and subjective. It is objective because it views the alleged provocation through the eyes of the ordinary man; it is subjective because the fact-finder must view from the actor's standpoint in order to determine 'the condition of the mind of the accused at the time of the offense,' which is necessitated by the mens rea requirement and emphasized by Section 19.06, from

which the quoted phrase is taken. The only Texas case found that alluded to the objective-subjective nature of the adequate cause definition, *Zimmerman v. State* [85 Tex.Cr.R. 630], 215 S.W. 101 (Cr.App.1919), affirmed that it is the ordinary man's response to the alleged provocation that is material, not the epileptic defendant's, but that the jury must place the ordinary man in the defendant's situation. (*Zimmerman* is unsatisfactory on this issue because the main defense was insanity, defendant at trial did not request a charge on his epileptic condition as bearing on the adequate cause issue, and only on appeal did he raise the issue, apparently as an afterthought. Most jurisdictions have applied the common-law's ordinary man test, however, thus ruling out conditions peculiar to the individual defendant that arguably made him easier to provoke. See Model Penal Code § 201.3, Comment at 47 (Tent. Draft No. 9, 1959).) . . . ."

█ As the Practice Commentary notes, said § 19.04 is a blend of the old and the new, and cases decided under former Article 1257c, as enacted in 1927, and those decided earlier under the former manslaughter statute are instructive in deciding the case before us.

█ An instruction on manslaughter is properly refused where there is no evidence whatever of adequate cause. *Hill v. State,* 11 Tex.App. 456 (1882). And it was well established under former Article 1257c that it was not error to fail to instruct on the issue of murder without malice unless there was some testimony raising the issue. *Garza v. State,* 479 S.W.2d 294 (Tex.Cr.App. 1972); *David v. State,* 453 S.W.2d 172 (Tex. Cr.App.1970); *Lucky v. State,* 495 S.W.2d 919 (Tex.Cr.App.1973), and cases there cited; *Simmons v. State,* 504 S.W.2d 465 (Tex. Cr.App.1974); 29 Tex.Jur.2d, Homicide, § 279, p. 514.

Here, the appellant had been living with the deceased but had been separated for two weeks. On the date in question he sells an air conditioner and buys a pistol, at

which time he appears cool and collected. He goes to a bar looking for the deceased. He engages her in argument and threatens to kill her. He follows her from the booth to a bar stool after she tried to discontinue the argument. He continues to argue with her and she finally goes back to a booth. After remarks by other men, he tells her to take the whole bar with her and laughs. He goes to the restroom and five minutes later returns and shoots the deceased.

■ It is true that there may have been provocation by Jobe and Jennings, but this cannot be considered unless they were acting together with the deceased. V.T.C.A., Penal Code, § 19.04(a).

In light of the record, we cannot conclude the evidence was sufficient to raise the issue of voluntary manslaughter, and the court did not err in failing to submit such issue to the jury.

Next appellant complains the trial court erred in failing to grant appellant's motion for new trial as the jury received other evidence after it began its deliberations.

Anita Richardson testified on the hearing on the motion for new trial that she was one of the jurors and that the foreman was Bobby Joe McMurray and the only man on the jury. She related that in the first vote following the penalty stage of the trial some jurors had voted for as little as five years and others as high as 99 years. She stated the foreman had then stated that if the appellant was given five years he would be out in nine months and probably wouldn't even go to the pen when given jail time credit. He also stated that if given 50 years he would be out on parole in 10 to 15 years. Richardson stated the foreman was admonished not to discuss parole in keeping with the court's instruction, but he stated it was something to keep in mind and "it was something we had to consider because it was a fact." Richardson admitted that the foreman did not purport to know the law regarding parole, but he was the only man on the jury and had told the jurors he had had previous jury service. In the five ballots taken, she testified she voted for five years the first two times and then for 10

years, for 25 years and finally for 50 years. She related she changed her vote from lesser punishment to 50 years after the foreman's remarks as she was influenced by his statements on parole.

Carol Artz, also a juror, testified the foreman stated appellant would be out in nine months if given five years and might not even go to the pen, that if the appellant was given 50 years he would be out on parole in 5, 10 or 15 years. She recalled he was admonished about his discussion, but had stated, "We still have to keep that in mind." She acknowledged that he never purported to know the law, but spoke with authority and "as if he knew what he was talking about." She stated she thought the appellant would only serve five years if she voted for 50 years and changed her vote.

Bobby Joe McMurray testified there was a discussion of parole laws, but he couldn't recall the figures mentioned and stated that no one purported to know the law, and he certainly didn't. He expressly denied the statements attributed to him regarding how long the appellant would serve if given 5 years or 50 years. He stated he had voted for 50 years on each ballot and was not influenced by any discussion of parole.

His wife, Lois McMurray, also a juror, testified that she could not remember any discussion of parole at all and couldn't recall her husband or any other juror making the statements attributed to him. She stated she voted for 50 years on each ballot.

Ruth Phillips, a juror, testified parole was mentioned, but she didn't recall any figures. She stated release on parole was a matter of common knowledge and it didn't influence her at all. No one mentioning parole purported to know the law according to her testimony. She related she first voted for 30 years and then later for 50 years.

Clara Kennedy testified there may have been some talk of parole, but she didn't remember exactly what was said because it didn't influence her. She stated she first voted for 25 years and later voted for 50 years.

Mrs. A. M. Marshall stated no one purported to know the law on parole, and while there was "quite bit of discussion about parole," it didn't influence her as she voted for 50 years on all ballots.

Maudie Lacy also stayed with 50 years on all ballots and stated the parole discussion did not influence her. She did recall "the five years—out in nine months" statement by the foreman, but did not remember any other statement he made on parole.

Mrs. Cliff Marshall testified there was "a little discussion" on parole but she didn't recall the details, but no one purported to know the law; that she was not influenced thereby as she made up her own mind on the 50 years' punishment.

Mrs. Austin McCowan testified parole was mentioned, but no one purported to know the law and she didn't remember the details of the discussion. She testified she was not influenced thereby. She voted for 99 years the first time, later for 60 years and then for 50 years.

Mrs. James E. Smith remembered the foreman saying something about parole and his being admonished, etc., but she couldn't remember for sure the figures mentioned and such discussion didn't influence her; that no one purported to know the law. She related she voted for 50 years on every ballot.

Mrs. George Reeves could not recall what the foreman said about parole, but that no one purported to know the law. She related the discussion didn't influence her. She voted first for 40 years and then later for 50 years.

 It is common knowledge that from time to time inmates of the Texas Department of Corrections are released on parole. See, e. g., Taylor v. State, 420 S.W.2d 601 (Tex.Cr.App.1967); Graham v. State, 422 S.W.2d 922 (Tex.Cr.App.1968); Heredia v. State, 528 S.W.2d 847 (Tex.Cr.App.1975). And not every mention of parole during jury deliberations calls for reversal. Daniel v. State, 486 S.W.2d 944, 946 (Tex.Cr.App. 1972).

In the instant case eleven of the jurors admitted parole laws had been discussed, but testimony varied from "mentioned" and "a little discussion" to "quite a bit of discussion." As to supposed misstatements as to the parole law, only jurors Richardson, Artz and Lacy testified that such misstatements were made by the foreman. The foreman McMurray created a sharp conflict by denying that he made such statements. His wife in effect helped to corroborate his testimony.

 The trial judge, as the trier of the facts, was free to believe one juror's testimony as to the absence of improper conduct in the jury room and to disbelieve and reject all or part of the testimony of the other jurors. See Daniel v. State, supra, and cases there cited. It is well established that issues of fact as to jury misconduct raised at a hearing on motion for new trial are for the determination of the trial judge, and where there is conflicting evidence there is no abuse of discretion where the motion for new trial is overruled. See McMillon v. State, 505 S.W.2d 872 (Tex.Cr.App.1974); Powell v. State, 502 S.W.2d 705 (Tex.Cr. App.1973); Brown v. State, 475 S.W.2d 938 (Tex.Cr.App.1971); Walton v. State, 398 S.W.2d 555 (Tex.Cr.App.1966); Roberts v. State, 172 Tex.Cr.R. 500, 360 S.W.2d 883 (1962), cert. denied, 371 U.S. 846, 83 S.Ct. 83, 9 L.Ed.2d 83; McGee v. State, 121 Tex. Cr.R. 188, 51 S.W.2d 714 (1932).

In Trevino v. State, 409 S.W.2d 853 (Tex. Cr.App.1966), it was held that the refusal to grant a new trial sought on the ground that a juror made a statement that if the defendant received a 30 year sentence for possession of marihuana he would be out in 8 years was binding on this court where there was a conflict in the testimony as to whether the statement was made. And in Surratt v. State, 117 Tex.Cr.R. 313, 35 S.W.2d 725 (1931), it was held that where a juror testifies to misconduct and several other jurors assert the contrary the court's decision negativing misconduct is not an abuse of discretion.

 In light of the conflicting evidence as to whether the statements were made,

there was no abuse of discretion in the court overruling the motion for mistrial.

The judgment is affirmed.