OLIN MERCER v. THE STATE.

No. 11728. Delivered June 23, 1928.
Rehearing denied February 20, 1929.

658

The opinion states the case.

*Will Hancock, Farrar & Wilson* and *Lem Wray* of Waxahachie, *McLean, Scott & Sayers* of Ft. Worth for appellant.

*A. D. Emerson,* County Attorney of Ellis County. *Henry Tiney,* Special Prosecutor of Dallas, *Frank B. Tiney,* Special Prosecutor of

Waco, *John H. Sharp,* Special Prosecutor of Ennis and *A. A. Dawson* of Canton, State's Attorney, for the State.

CHRISTIAN, JUDGE.—The offense is murder; the punishment confinement in the penitentiary for 35 years.

Appellant contends that the caption of Chapter 274, Acts of the Fortieth Legislature, defining murder and repealing the law of manslaughter, is insufficient in that no reference is made therein to Section 3-a of said act. Section 3-a of said act requires the court to define malice aforethought and apply such term by appropriate charge to the facts in the case, and further instruct the jury that unless under the facts and circumstances in evidence the jury believe that the defendant was prompted and acted with malice aforethought they cannot assess his punishment at a period longer than five years. The caption of said act provides:

"An Act amending Articles 1256 and 1257 of the Penal Code of 1925, so as to properly define murder, and fixing the punishment for murder; inserting in the Penal Code a new article Number 1257-a, relating to what may be proved, and considered by the jury, in determining the punishment to be assessed for murder; repealing Chapter 15, of Title 15, of the Penal Code of 1925, relating to manslaughter, and all other laws in conflict with this act, repealing Chapter 18 of Title 15 of the Penal Code of 1925; and declaring an emergency."

The Fortieth Legislature at its First Called Session re-enacted Section 3-a under a caption as follows:

"An act amending Section 3-a of Chapter 274 of the general laws of the Regular Session of the Fortieth Legislature, so as to insert therein a saving clause in reference to offenses committed before said act takes effect so that Section 3-a shall read as follows: Section 3-a. In all cases tried under the provisions of this act it shall be the duty of the court to define 'malice aforethought' and shall apply that term by appropriate charge to the facts in the case and shall instruct the jury that unless from all the facts and circumstances the jury believes the defendant was prompted and acted with his malice aforethought, they cannot assess the punishment at a period longer than five years; provided however, that no offense committed prior to the taking effect of Chapter 274 of the general laws of the Fortieth Legislature so in force shall be affected thereby, whether an indictment has been returned or not, but in every such case the offender may be proceeded against and punished under the

law as it existed prior to the taking effect of said act, the same as if said act had not been passed; and declaring an emergency."

See Chapter 8, Acts of the Fortieth Legislature at its First Called Session.

Section 35, of Article 3, of the Constitution of Texas provides:

"No bill (except general appropriation bills which may embrace the various subjects and accounts for and of account of which moneys are appropriated) shall contain more than one subject, which shall be expressed in its title, but if any subject shall be embraced in an Act which shall not be expressed in the title such act shall be void only as to so much thereof as shall not be so expressed."

A liberal construction will be applied in determining whether or not a statute violates this section, and where the provisions are germane in any degree the law will be upheld. Davis v. State, 225 S. W. 532. Under the express provisions of Article 3, Section 35, of the Constitution an act containing matters not included within the caption is void only as to the extraneous provisions, provided such extraneous provisions are separable from the others. Davis, supra. The word "subject" in the Constitutional provision above quoted is used in the same sense as the word "object" in former constitutions. Fielder v. State, 49 S. W. 676. The word "object" under former constitutions was construed by the courts to mean "end or purpose." Giddings v. San Antonio, 47 Tex. 573; Breen v. Railway Company, 44 Tex. 302; Stone v. Brown, 54 Tex. 331, State v. McCracken, 42 Tex. 384; Railway Company v. Odum, 53 Tex. 344; Railway Company v. Smith, 54 Tex. 1. It appears to have been the object and purpose of the statute in question to repeal the law of manslaughter and thus avoid the necessity of complicated and confusing charges on the subject, and to further redefine the law of murder. We think the general object of the law is fairly indicated by its caption. It does not appear that any incongruous legislation is embodied in the act. Section 3-a, although not specifically mentioned in the caption of the bill, falls fairly within the general object and in our opinion should be considered by fair intendment as necessarily and properly connected therewith. Where a law has but one general object, which is fairly indicated by its title and can be considered by fair intendment as necessarily and properly connected therewith, the generality of the title is not objectionable, if not made a cover to incongruous legislation; the provisions of the act being liberally construed to avoid serious embarrassment of legislation. Stuard v. Thompson, 251 S. W. 277. In any event, Section 3-a was later re-enacted under

a caption whose sufficiency has not been questioned. Section 3-a seems to be separable from the other provisions of the act in question. If the caption of Chapter 274, supra, should be held insufficient in the respect mentioned, which is not conceded, still under the express language of the Constitutional provisions the act would be void only as to said Section 3-a, and the legislature having re-enacted said section at length under a sufficient caption, the entire act under which appellant was tried is not now subject to the criticism he makes.

Appellant further contends that the act is unconstitutional because of uncertainty, lack of clearness and conflict in its terms. Appellant's contention has been passed on adversely in Crutchfield v. State, Opinion Number 11,418, delivered June 6, 1928.

By timely exception complaint was made of the failure of the court to apply a definition of malice aforethought to the facts. The court instructed the jury, in substance, that if they had a reasonable doubt from all of the facts and circumstances in evidence that appellant acted with malice aforethought they could not assess his punishment at a longer period than five years. This was a sufficient application of the law to the facts. Crutchfield, supra.

We have carefully considered all of appellant's objections to the court's charge. We note that practically all of the numerous special charges requested by appellant were given. The main charge and special charges considered together appear to have fairly presented the law of the case, and we find no error which in our opinion was prejudicial to the rights of appellant.

According to the state's theory, appellant having seen deceased enter the post office in the town of Maypearl, drove to the post office, took a shotgun from his car and fired several shots at deceased. It was further the state's theory that when deceased left the building from the rear in an endeavor to get away from appellant, appellant returned to his car, reloaded his shotgun and again sought deceased for the purpose of killing him; that deceased hid behind a barrel at the rear of a building; that finding deceased appellant shot him with a shotgun, struck him over the head with the gun and finally shot him with a pistol. The state's theory is amply supported by the evidence. Deceased was armed with a pistol at the time. The day before the homicide appellant and deceased had had a difficulty and deceased had drawn a pistol on appellant. On other occasions deceased and his cousin, Grover Tirey, had made attacks on appellant. Appellant had married the divorced wife of Tirey, and there was

evidence of ill feeling between Tirey and appellant. It was appellant's theory, given support in the evidence, that deceased had aligned himself with Tirey, had threatened to kill him, and was endeavoring to execute the threat on the occasion of the homicide. Appellant testified that deceased fired at him from the postoffice; that he was not seeking deceased when he went to the point where deceased was barricaded behind a barrel; that deceased began shooting at him from behind the barrel; that he killed deceased because deceased was seeking to kill him. We deem it unnecessary to recite the evidence in detail.

Bill of exception Number 1 reveals that a witness for the state testified over the objection of appellant, in substance, that after the first difficulty in the post office deceased came out of the back door limping, although walking at a fast gait, and that he told deceased that he had better get out of the way.

Appellant objected to this testimony "for the reason that it was not shown that the defendant knew of the conversation, advice, and warning said witness gave deceased at the time, and defendant did not know that deceased was crippled, and did not know that deceased was retreating or trying to get out of the way at the time; and further, because the evidence shows that the defendant did not know of any of these conversations, conditions or intentions of deceased and the same are harmful and prejudicial to defendant and presented to the jury matters affecting the defendant's viewpoint, facts and evidence undisclosed to the defendant before the killing." Appellant contends that the testimony objected to impinged upon his theory of self-defense. We quote from Bazanno v. State, 132 S. W. 777, as follows:

"The cases in which the actions, declarations and intentions of a decedent are held not to be admissible against a defendant who has no notice of them, has always been limited to cases where the issue of self-defense arose in the case, and where such acts and movements of deceased could be held to be hostile in their character, and where such defendant had a right to act upon an apparent hostile movement toward him which might, if the rule permitted it, be shown to be in fact innocent."

While appellant interposed the plea of self-defense, our analysis of the bill convinces us that no part of the testimony complained of affected appellant's defensive theory. It was undisputed that deceased had a pistol and at some time during the second difficulty fired at appellant. The movements of deceased after leaving the

post office as detailed by the witness were not contradictory of appellant's theory that deceased was barricaded behind a barrel with a pistol. In other words, the movements of deceased at the time of the homicide as disclosed by appellant were not contradictory of the testimony complained of. Thus, we are constrained to hold that reversible error does not appear.

Appellant offered to prove that several parties had warned him that deceased was going to kill him. Such warnings did not involve any threats by deceased to do appellant bodily injury. In short, the warnings sought to be proved were mere opinions of third parties to the effect that deceased intended to kill appellant. For example, appellant would have testified that one of his friends said to him:

"I guess you see now that s— of a b— means to kill you?"

Again, appellant would have testified, if he had been permitted, this his father advised him that deceased would kill him if he ever got the opportunity. The court permitted appellant to prove all threats, acts or demonstrations on the part of either deceased or Grover Tiery, which had been communicated to appellant, or of which he had knowledge or information. Appellant contends that the proffered testimony was admissible under the express provisions of Section 2, Chapter 274, Acts of the Regular Session of the 40th Legislature, which provides:

"In all prosecutions for felonious homicide the State or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the homicide, which may be considered by the jury in determining the punishment to be assessed."

Prior to the enactment of Chapter 274, supra, the testimony contended for would have been inadmissible. Crockett v. State, 77 S. W. 4; Britton v. State, 294 S. W. 541.

Has the rule been extended by Section 2, supra? We think not. The legislature evidently intended, in enacting Chapter 274, supra, to eliminate the necessity of giving a charge on manslaughter. There is nothing in the act to indicate that the legislature was attempting to announce a rule of evidence,—and this, nothwithstanding the fact that that body was aware of the general principles controlling the admissibility of evidence in the trial of homicide cases as announced in the decisions of this and other jurisdictions. We are not led to believe that the legislature, acting with knowledge of judicial prec-

edents, would have failed to have expressly extended the rules of evidence in cases of homicide, had such been the intention of that body. On the contrary, it seems logical to conclude that it was the legislative intention to secure to the accused the benefit of the rules of evidence available under the repealed law of manslaughter respecting the admissibility of relevant facts and circumstances showing the condition of the mind of the accused at the time of the homicide. It follows that reversible error is not manifested.

It was the state's theory, supported by testimony, that appellant sought deceased and ruthlessly killed him. It was appellant's theory, that Grover Tirey and deceased had on several occasions made a joint attack on him; that each of said parties had threatened to kill him; and that he acted in self-defense when he killed deceased. About two years before the homicide, appellant, after having had trouble with deceased and Tirey growing out of appellant's marriage to Tirey's divorced wife, moved to Dallas, where he lived until about December, 1926, at which time he returned to his farm near Maypearl. Appellant testified that two years prior to the homicide, he would turn out of the main highway where it passed Tirey's house and pursue a less favorable route from his home to town. Appellant offered to testify that he left Maypearl and the vicinity in which deceased and Tirey lived and moved to Dallas in order to avoid trouble with deceased and Tirey, as he did not want further trouble with them. He further offered to testify that he traveled a circuitous route in going to town in order to avoid meeting Tirey and deceased as he did not want to have trouble with them. The court repected these statements and qualified appellant's bills of exception to the effect that it had been several months since appellant had returned from Dallas and two years since appellant had avoided passing Tirey's house. It is further shown by the qualifications that appellant, Tirey and deceased had passed and repassed many times subsequent to the times mentioned by appellant, without any hostile demonstration being made by either of them. The record shows that the court permitted every witness offered by appellant to testify to any threats, acts or conduct on the part of either Tirey or the deceased. The record further discloses that on the morning of the day before the killing appellant ordered deceased away from a place belonging to him, and that on the evening before the killing appellant and deceased had had a difficulty in which deceased had drawn a pistol on appellant. Tirey was not present and had no connection with these incidents. Neither was he present on the occasion of the

homicide. The record further shows that appellant testified on direct examination that he did not want any trouble with deceased and Tirey and that he had avoided them. We quote from appellant's testimony on pages 83 to 84 of the statement of facts as follows:

"Afterwards I went on to the foot-ball game but did not go anywhere near the fifty-yard line where so many people were, but stayed out at the edge where there was not so many because I did not know where Tirey and Maxwell were and was afraid I might run into them, and the impression it made upon me from seeing their actions was that they had a hostile intention toward me. I did not want any trouble with them over there that day in the Smith Lane. After I came back from Dallas, which was January 10th, 1927, I would see Grover Tirey and Bobby Maxwell together occasionally and see them watching me and taking a good view as to my actions, and on one occasion after a rain they were on a road coming out of Maypearl and I had started down to my place, and the road being muddy and they pretended that they were stuck, and stopped a little up the road, and then I came to the place I went right on through it, and they looked back at me and watched me pretty close, and I did not go any further because I had been warned so much to watch them and I did not want any trouble, and I have on occasions to avoid them gone out of the regular road on occasions when I felt that I would meet them; have often gone out of the regular road from Maypearl to my place to avoid meeting them."

In this state of the record, we think it manifest that a reversal could not be based upon the rejection of the evidence sought to be introduced.

As shown by bill of exception Number 15, appellant objected to the introduction of the bloody clothes of deceased. As qualified by the court the bill shows that there was an issue as to whether or not deceased was shot in the back, upon which issue the clothes had material bearing. This being the case the trial court's action is supported by the decisions of this court. King v. State, 286 S. W. 231, and authorities cited.

We have undertaken to discuss all matters presented by appellant in oral argument and several matters dealt with in appellant's brief, but not presented orally, have been discussed. All questions presented for review have been carefully considered in the light of appellant's able brief. We have been unable to find reversible error.

The judgment is affirmed.

*Affirmed.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

## ON MOTION FOR REHEARING.

MORROW, PRESIDING JUDGE.—The following is a synopsis of the State's evidence of incidents immediately attending the tragedy. The encounter first took place in a building occupied by Hooser's Drug Store and the post-office, which fronted east on Main Street about thirty feet from Second Street and about 45 yards southwest of Hess & Thompson's garage. Having a shotgun in his automobile, the appellant drove three blocks to the garage mentioned, where he loitered for about 30 minutes. The deceased appeared on Main Street opposite the garage, walked in the direction of and entered Hooser's Drug Store. Dismounting from the car, the appellant went rapidly to the side-walk of the drug store and fired into the drug store four or five times, after which he entered it and fired three more shots. At the time the shots last mentioned were fired the deceased was stooping behind some object in the post-office. He was in his shirt sleeves. Immediately after the shots last mentioned were fired, the deceased, leaving a pool of blood and the pistol where he was stooping, left the drug store through the rear door. The appellant left the post-office, and went to his automobile, where he reloaded his pump shotgun. He returned, ran to the sidewalk in front of the post-office, looked through the post-office and drug store building with the gun in his hand, and then ran south, passing three buildings, to the front of a hamburger stand on Main Street. The deceased, in the meanwhile, limping and dragging one leg, went from the rear of the drug store, passed the same three buildings and stopped at the rear of the hamburger stand but did not enter it. As he turned from it shots were fired from the hamburger stand. The appellant emerged from the rear door with the gun in his hand. The deceased, in the meantime, took refuge behind an iron barrel in the rear of the building adjoining the hamburger stand. The appellant ran to the deceased, struck him with his gun and shot him with his pistol. After the shooting in the drug store and post-office and after the appellant had reloaded his gun, witnesses asked him not to shoot any more.

The following is the appellant's version: He left the filling station and went to the drug store for medicine. As the deceased entered the drug store he drew his pistol from his bosom and ap-

peared to be endeavoring to shoot from behind a bystander. Upon observing this the appellant grabbed his shotgun and fired into the drug store two or three times, believing that his life was in danger. After firing several shots he entered the drug store, and the deceased either fired or snapped his pistol. He entered the drug store because he was observable by the deceased who was squatting behind a desk. After entering the drug store the appellant fired at the deceased and thought he heard him say: "Bring me a gun, Grover; shoot him, Grover," from which he believed that Grover Tirey was coming to the aid of the deceased. Upon leaving the drug store the appellant did not know whether or not the deceased was injured. He got some shells from his car but due to his excitement, he could not say whether he reloaded his gun. He went on foot to the hamburger stand without knowledge that the deceased was there. He entered the hamburger stand for the purpose of avoiding the deceased, but upon hearing some one say that the deceased was approaching, he went to the back door of the hamburger stand and observed the deceased with a pistol in his hand. The deceased fired his pistol and jumped to the left of the door near a window through which the appellant could be seen. Appellant went out the back door and observed the deceased behind a steel barrel in the rear of the building, from which point he fired at the appellant. The appellant's shotgun snapped and he pulled his six-shooter from under his belt. While the deceased was pointing his pistol at him, the appellant hit the pistol with his shotgun and shot the deceased with his pistol.

Concerning the attack upon the statute re-defining murder and abolishing the specific offense of manslaughter embraced in Chap. 274, Acts of the 40th Legislature, and the request for instructions to the jury on the assumption that the act was invalid, we refer to the discussion of the subject in the original opinion in this case and in Davis v. State, 10 S. W. R. (2d) 116; Crutchfield v. State, 10 S. W. R. (2d) 119.

Supplementing the remarks made in the original opinion in this case relating to Bill of Exceptions No. 1, we take note of the fact that the bill mentioned is qualified with the statement that after the shooting in the drug store and post-office building the witness Waller testified that as the deceased came out of the building the witness told him to get out of the way. He was walking down the street behind the stores. The deceased made no reply. In qualifying the bill the stenographic report of the testimony of the witness Waller on the subject in hand is reproduced. We find nothing in it to the

effect that the deceased was limping. It appears only that when the deceased came out of the back door of the drug store the witness told him to get out of the way. There is nothing in the testimony indicating that the deceased changed his course or that he said or did anything in response to the remark of the witness that he get out of the way. There was also evidence quoted in the bill that the appellant looked through the store and from where he was standing he could see through it; that after looking through the store he ran down the street with his gun in his hand. From the bill no error is perceived. The soundness of the contention that by the bill there is revealed a departure or conflict from the rule that one defending on the plea of self-defense is not affected by the unknown or undisclosed motives of his adversary, this court is unable to sanction. As stated in the original opinion, Sec. 2, Chapter 274, is not regarded as broadening or expanding the rules of evidence in homicide cases, but is intended merely to emphasize the legislative intent that existing rules have not been abrogated. The paragraph is not deemed to have added or subtracted from the law of evidence as understood and applied at the time the act was passed.

In paragraph 13 of the court's charge there was embraced an instruction to the jury on the law of abandonment of the difficulty by the deceased. In the same paragraph there was embraced the converse of that theory in substance as contained in the appellant's special charge No. 5, which special charge was given at the request of the appellant after the main charge was prepared, and which special charge reads thus:

"You are further instructed that if you believe from the evidence, or have a reasonable doubt thereof, that after the first shooting in the Hooser Drug Store and Post-office, if any, that the defendant re-loaded his gun and went to Lyerla's Hamburger Stand without knowing what had become of the deceased, and while there was suddenly confronted by the deceased under such circumstances as it reasonably appeared to him, defendant, viewed from his standpoint at the time, that he was in danger of losing his life, or sustaining serious bodily injury from the hands of deceased, he would have the right to use all means necessary to defend himself, and if you further believe that viewed from the defendant's said standpoint it appeared to him that the deceased was retreating to a vantage ground for the purpose of gaining an advantage over the defendant and shooting him through a window or other aperture in the building, and the defendant under such belief pursued the deceased, in such pursuit

passed out at the back door of said building and thereafter discovered the deceased behind a barrel and further attempting to shoot deceased—and it then appeared to the defendant that it was necessary for him to advance upon deceased as the best means for his defense, and he did so pursue and advance upon deceased, and it reasonably appeared to defendant that it was necessary to kill deceased to avoid being, himself, killed, or sustaining serious bodily injuries, and he did kill deceased by shooting him with a gun or pistol, then defendant would be justifiable under the law of self-defense and you will acquit him."

The charge of the court is attacked in the twelfth and thirteenth paragraphs of the exceptions thereto upon the assertion that the facts warranted no instruction on the issue of abandonment of the difficulty by the deceased. In the light of the evidence before the jury and the record presented, the court is not deemed to have committed error in refusing to eliminate that part of his charge which dealt with the subject of abandonment of the difficulty by the deceased. That such a charge, on appropriate facts, should be given has often been declared. See Bordeaux v. State, 58 Tex. Crim. Rep. 61; Neyland v. State, 79 Tex. Crim. Rep. 652; Swann v. State, 92 Tex. Crim. Rep. 153.

The propriety of receiving in evidence the apparel worn by the deceased where it tends to solve a controverted issue of fact is not open to question. See Trigg v. State, 99 Tex. Crim. Rep. 376, and authorities collated. In the present instance the bill of exceptions as qualified, declares that the trial presented an issue of fact upon which the clothing worn by the deceased was relevant.

The motion for rehearing is overruled.

*Overruled.*