Clifton Gregory FOSTER, Appellant,

v.

The STATE of Texas, Appellee.

No. 58654.

Court of Criminal Appeals of Texas.

March 17, 1982.

Rehearing Denied Oct. 27, 1982.

Russell T. Van Keuren, Houston, for appellant.

Carroll E. Wilborn, Jr., Dist. Atty., & Elliott Knott, Asst. Dist. Atty., Liberty, Robert Huttash, State's Atty., Austin, for the State.

Before ONION, P.J., and W.C. DAVIS, J.

## OPINION

W.C. DAVIS, Judge.

This is an appeal from a conviction for murder. Punishment was assessed by a jury at 12 years confinement.

The appellant contends that there is no evidence that he intentionally or knowingly caused the death of the deceased, Princess Ann Smith. We agree and reverse.

The State's first witness was Michael Garofalo. Garofalo, who was a police officer at the time of the alleged offense, testified that on December 13, 1976, he investigated the shooting of Princess Ann Smith. Garofalo was dispatched to the East Memorial Mortuary at 2:12 a.m. He and his partner Roy Rogers entered the building with their weapons drawn. There they saw the body of the deceased on the floor; the appellant was standing at the bottom of the stairs, crying "I killed my baby. Oh, God, I killed my baby. What am I going to do." The officers holstered their weapons. Garofalo stated that he checked the body for life signs, but found none. Garofalo then walked over to the appellant; the appellant put his arms around Garofalo and Garofalo took him outside and left him with the wrecker truck driver, E.C. Clankie.

The State introduced into evidence several photographs which depicted the scene of the shooting. One picture showed that there were two twin beds in the upstairs bedroom. One bed was made up, the other was not. On one bed there was a purse, a bra, keys, a pistol and some bedding. There was blood on the corner of the unmade bed. Next, several photos followed the trail of blood from the bed to the top of the stairs where there was a large pool of blood and one of the deceased's slippers. Blood was smeared on the wall at the top of the stairs, there were spots of blood going down the stairs. Finally, there were a couple of pictures of the deceased as she was found, downstairs on the floor.

Garofalo testified that after he had taken the appellant outside, he went upstairs and found a .38 caliber pistol on the bed. He noted that the safety was on the gun. There were four live shells in the gun, one shell was spent, and there was one empty chamber. Three of the live rounds had indentations or scratches on the primer. Garofalo explained that these indentations were caused because on this particular gun, the chamber could not be rotated when shells were in the gun because the firing pin sticks out too far and rests on the shells.

On cross-examination, Garofalo testified that the weapon was unsafe. He also stated that finding the empty chamber was significant because "[u]sually a person with that type of pistol will carry the firing pin on an empty chamber to keep the rounds from discharging" for safety reasons. Garofalo stated that there was a possibility that the gun would discharge with the safety on. Finally, he stated that there were no other signs of violence, such as evidence of a struggle, aside from evidence of the shooting.

John Beene, a chemist and firearms examiner, testified that the pistol, State's Exhibit 16, was a "quite old" cowboy ranger model. The gun was unusual because it had a "thumb-type safety" on it. This meant that the trigger and hammer would move to a "limited extent" even with the safety on. However, it was Beene's opinion that the gun would not discharge while the safety was engaged.

On cross-examination, Beene agreed that in order to find the empty chamber on the gun, it was necessary to pull the hammer back, and if someone's finger slipped off the hammer while doing this, the gun would discharge. The gun was defective for this reason, Beene stated.

Beene also conducted tests on fabric samples from the shirt the deceased was wearing at the time of her death. From the results of the tests, Beene concluded that the muzzle of the gun was approximately two inches from the shirt at the time the shot was fired. On cross-examination, Beene agreed that his findings were consistent with two people sitting side-by-side on a bed when the weapon was discharged.

Roy Rogers assisted Garofalo in the investigation of the deceased's death. Rogers stated that after they arrived at the scene, the appellant grabbed Garofalo and cried on his shoulder. Rogers also testified regarding the trail of blood from the bedroom to the large pool of blood at the top of the stairs. "There was blood splattered on the wall, and the blood was smeared as if the victim had ran into the wall at the end of the hallway" he said. On cross-examination by defense counsel, Rogers stated that he believed the appellant had called the ambulance before he called the police; the ambulance was there when he and Garofalo arrived. The appellant was "highly excited" at the scene, stated Rogers. Rogers agreed that he and Garofalo had holstered their weapons because they realized that the appellant was not a threat to them.

The defense attorney asked Rogers,

"Q. Did you hear [appellant] say to Mike [Garofalo] that it was an accident?

A. At any time during the night?

Q. Yes.

A. Yes, sir.

Q. You did hear that. No question in your mind about that?

A. No, sir, I heard him say it was an accident."

On re-direct examination, the prosecutor asked Rogers,

"Q. Did you tell [defense counsel] here that you heard the Defendant Foster tell Mike that this shooting was an accident?

A. Yes, sir.

Q. All right. Where was he when he told you how this accident happened?

A. He said he was on the bed."

Eugene Clankie testified that he drove his wrecker to the funeral home that night, arriving after the police and the ambulance. Clankie said that Officer Garofalo brought the appellant outside and asked him to stay with the appellant. Clankie stated that the appellant had pants on, but was barefoot. The appellant had blood on his hands and feet. The prosecutor asked Clankie,

"Q. Did you have a conversation with him out there?

A. He was telling me what he did. He killed his baby. We was just talking about it and what had happened, and he said he pulled a gun out from under a pillow so she could make up the bed and it went off."

Dr. Joseph Jachimczyk testified that he performed the autopsy on the deceased. Jachimczyk said the external examination of the deceased revealed an oval blunt laceration on the tip of her chin. Also there was a scrape mark over the right eye and a "round-type" abrasion measuring one quarter of an inch in diameter over the left eye. The gunshot entrance wound was just to the left of the deceased's left nipple. The bullet went through the fourth left rib, through the heart and one lung, came out at the fourth right rib and entered the deceased's right arm. Jachimczyk determined from the stippling around the en-

trance wound that the gun was fired from two to four inches away. The doctor testified that the lacerations on deceased's face were caused prior to her death and that the deceased's right arm had to be down alongside her body, "possibly straight down" when she was shot.

On cross-examination, Dr. Jachimczyk testified that the parties could not have been facing each other when the deceased was shot. They "just about" had to be side by side when the shot was fired. Jachimczyk also stated that the lacerations on the deceased's face were very consistent with the deceased running into a wall after being shot. The wound did not appear to have been caused by a strike from a fist or a hand. On re-direct examination, the doctor also agreed with the prosecutor that the chin wound was consistent with being struck with a hard object on the chin.

Katy Jackson, the deceased's mother, testified that her 22-year-old daughter had been going with the appellant for about a year. The prosecutor asked Jackson,

"Q. Did they always get along harmoniously, or would they break up?

A. Well, they would break up.

Q. Did they separate more than once?

A. Yes. I think they separated—Every weekend they met it would be some kind of problem."

Johnson testified that she had seen the appellant twice.

The 20-year-old appellant took the stand and testified that at the time of the shooting, he worked as a security guard and also operated the East Memorial Mortuary, an establishment he inherited from his grandfather. The appellant stated that he had been working two jobs in order to save money because he had planned to marry the deceased in the future. The appellant related that on the night of the deceased's death, he arrived home from work between one and one-thirty a.m. The deceased was spending the weekend with appellant. When the appellant got home, the deceased and a neighbor were there. The deceased had prepared a meal for the appellant. While the appellant ate, the deceased took the neighbor, John Kibble, home. Appellant testified that Kibble, his 14-year-old neighbor, stayed with the deceased because she did not like to wait there by herself.

When the deceased returned, they went upstairs to go to bed. The deceased wanted to change the sheets. As she was changing the sheets, the appellant remembered that he kept his grandfather's pistol under the pillow of that bed. The appellant testified,

"When I reached and got the pistol, she came around and got the pillow. And I guess she was gonna change the pillowcase. So, at that time I was sitting down with the pistol. I always check it to see where the loads are, where the empty chamber is. And when I check it I remember to put the hammer—set on this empty chamber, because I dropped it many times and I know if I dropped it and it is on one of these loads, it will go off. So, at that time she was beginning to tell me about something else that had happened that day and she came and sat right beside me. And I still had the pistol in my hand. I was looking at it and she sat down right in front of me.

Q. Would you put a "p" there where she sat down?

A. (Witness complies)

Q. Is that alongside of you there?

A. That's alongside of me.

Q. All right. And where are your feet?

A. (Indicating) My feet are right here.

Q. Where are her feet?

A. (Indicating) Her feet were right here. She wasn't exactly side by side. She was more catty-cornered, like this (Indicating) So, at the time she was talking, I stopped doing what I was doing—I still had the gun in my hand— and I started paying attention to what she was saying. I was looking at her in her face. She realized I had the gun pointed at her. I hadn't realized it. She said, 'That gun. Move that gun.' She said something to that effect. When I went to move the gun, it went off. Then she got up, she looked at me

and she ran. She stumbled at the bed. She stumbled on the bed, but she didn't fall. She ran down to the end of the hall into a wall. I was looking at her. Everything seemed like it was in slow-motion—something that was on T.V. I ran back behind her at that time. I saw her run into the wall at the end of this hall. When she ran into this wall, she fell in front of this stairway where all the blood was. I went there and turned her over and picked her up in my arms, and then it looked like she died in my arms."

On cross-examination the appellant stated that he did not know if the safety was on the gun but said "It had to be off because I didn't click it to pull it off." He further stated he was not accustomed to guns; he had shot the pistol only once previously.

John Kibble testified that he had been at the appellant's home when the appellant came home from work that night. While he waited for the deceased to take him home, the deceased and appellant laughed and talked. The appellant ate and then the deceased took him home. Kibble stated that they did not argue while he was there and that they acted like two people in love.

 In examining the evidence to determine if it is sufficient on the element of culpable mental state, we find that not only has the State failed to prove that appellant knowingly or intentionally killed the deceased, but that the evidence introduced by the State on that issue was exculpatory.

There is a presumption that specific intent to kill may be presumed from the defendant's use of a deadly weapon. *Fentis v. State,* 528 S.W.2d 590 (Tex.Cr.App.1975). However, in view of the evidence presented in this case by both sides, we find that the presumption of intent to kill was rebutted. There remains no evidence that the appellant intentionally or knowingly killed the deceased. Accordingly, the evidence is insufficient to sustain the conviction.

The judgment is reversed and remanded with instructions to enter a judgment of acquittal. See *Burks v. U.S.* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978).