**Raymond GONZALES, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 63964.**

Court of Criminal Appeals of Texas, En Banc.

May 15, 1985.

R. Leonadis McKinney, III, Colorado City, for appellant.

Frank Ginzel, Dist. Atty., Colorado City, Russell L. Carroll, Asst. Dist. Atty., Sweetwater, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

McCORMICK, Judge.

This is a direct appeal of a conviction for murder wherein punishment was assessed by the jury at fifty years' confinement. We will affirm.

Appellant challenges the sufficiency of the evidence, arguing the trial court erred in overruling his motion for new trial on the ground that the verdict rendered is contrary to the law and evidence. See Article 40.03, V.A.C.C.P. The standard by which we measure sufficiency of evidence was established in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979): "The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." See, *Benson v. State,* 661 S.W.2d 708, 714 (Tex.Cr.App.1982) (Opinion on State's Second Motion for Rehearing).

The State's evidence at the guilt stage of the trial reveals that Raymond Gonzales and the deceased, Malva Forbes, lived together with their infant daughter and Jebby Forbes, Ms. Forbes' twenty-year-old son. On January 28, 1978, appellant Gonzales and Ms. Forbes arrived at their home in the early evening arguing. As the argument continued, the deceased told her son Jebby that Gonzales had been hitting her, whereupon Gonzales stated that he was going to shoot a cat that had apparently wandered into the house. Gonzales appeared intoxicated to Jebby Forbes, who left the couple arguing in the kitchen to go to the bathroom. While in the bathroom, Jebby heard a shot and his mother say, "He shot me." Jebby dashed to the kitch-

en to find his mother sitting in a chair bleeding from a wound in the chest. Appellant had a pistol in his hands and a "mean look on his face." He pointed the gun at Jebby, who ran into another room, closed the door, and held it while Gonzales attempted to force his way in. Shortly thereafter, Jebby wrestled the gun from appellant, who was attempting to make a phone call. The phone was ripped from the wall in the scuffle and the pair landed out in the back yard, where Jebby pointed the gun at appellant. Appellant retrieved a rifle from a bedroom and pointed it at Jebby as he fled the scene in a pickup truck. Jebby testified that he drove directly to his grandmother's house, where he reported the shooting to police.

Joe Urbanasky, a chemist from the Department of Public Safety, testified that he examined the blouse worn by the deceased and performed tests to show the distance of the shot by comparing the powder residue around the bullet holes in the blouse with powder residue from two controlled test shots. In Urbansky's opinion, the pistol was a distance of between four feet and seven feet away from the victim when fired, and it would have been impossible for both victim and assailant to have had contact with the pistol at the time it was fired due to the awful long distance to stretch. Ronald B. Richardson, an employee of the Firearms Section of the Scientific Crime Laboratory of the Texas Department of Public Safety, also testified. He opined that the bullet retrieved from the body of Ms. Forbes was shot from the appellant's weapon, a single action revolver. He also explained that in order to remove the cylinder from that particular handgun, the hammer had to be forward and the loading gate down. Richardson further testified that, in order to fire, the gun had to be manually cocked each time, and when the gun was cocked the loading gate would not come down to permit removal of the pin and cylinder. Bobby Sparks, a reserve sheriff's officer, also testified about the gun and explained that it could not be fired unless

the hammer was fully cocked because only in the fully cocked position did a transfer bar come up between the hammer and the firing pin. Sparks explained that the hammer of the gun did not strike the firing pin directly, so the transfer bar had to be raised between the hammer and firing pin in order for the gun to be fired.

The State called three witnesses to testify about the previous relationship existing between appellant and the deceased. See, V.T.C.A., Penal Code, Section 19.06. The victim's mother testified that, while she was staying with appellant and her daughter during the previous year, appellant threatened the life of the deceased while he was drunk. Pamela Owens, the deceased's daughter, testified that within the previous year the couple had had frequent fights and difficulties in their relationship. She recalled an incident where appellant had beaten her mother, giving her a bloody nose and swollen jaw. The victim's sister testified that when she visited the couple at their home in July, 1977, an argument ensued over shooting a pig during which appellant got out his gun, pointed it at the deceased and said, "Shut your goddamn mouth, or I will shoot you."

■ Gonzales testified in his own behalf and related that he did beat the deceased during one incident but the beating occurred after she had threatened to kill him. According to appellant, on the day of the shooting he drank very little but Ms. Forbes was drunk. He and Ms. Forbes were arguing over Jebby leaving marihuana seed and "roach" butts in his car. Ms. Forbes was cursing him so he told her to go to bed. He took her to bed and laid her down. He wanted something to do with his hands so he got up and took the gun from the chest of drawers. He was cleaning the gun in the kitchen when Ms. Forbes entered, still arguing with him. She said, "You goddamn son-of-a-bitch Mexican, I hate you." She talked to him like that on many occasions, he testified, and at the time he was angry and upset but he was not upset to such a degree that he wanted to hurt her.

The shooting occurred, according to appellant, while he was trying to remove the cylinder from the weapon in order to clean it. He testified that he was sitting at the kitchen table with the gun. He stood up with the gun and Ms. Forbes stood up too. He had the hammer back to pull the cylinder out. When she reached for him to try to get the gun away from him, he pushed her. She tripped over a rug and fell toward him. The gun went off. She was almost right on him when the gun went off. Gonzales attempted to refute Jebby's version of the events immediately after the shooting. He testified that he pointed the gun at Jebby Forbes to show him that he did not think it was loaded and Jebby ran to his bedroom. Appellant then attempted to use the phone to call the police. Jebby grabbed appellant from behind as he was dialing the number and wrestled him out the back door and proceeded to get the gun away from him, pointing it at Gonzales. Gonzales testified that he retreated to his bedroom to get his car keys. After Jebby left, Gonzales drove to a friend's house, but no one was home. He then went to the home of Jack Autry, told Autry that he had accidentally shot Ms. Forbes and asked Autry to call the police. When Gonzales returned to the house with Autry, he was taken into custody by police.

The State chemist's testimony indicating that the victim was from four to seven feet away from the gun when it fired and the ballistic investigator's testimony concerning the inability of the murder weapon to fire unless the hammer was completely cocked directly contradict appellant's assertion that the shooting was an accident that occurred while appellant was trying to clean the weapon. It is also significant that the officers who first arrived at the scene testified that there was no gun cleaning articles on the kitchen table when they arrived, not even the screwdriver appellant claims to have been using to initial the gun.

The discrepancies between the appellant's version of the shooting and the evidence presented by the State, together with the testimony of Jebby Forbes about the argument prior to the shooting and conduct of appellant immediately afterwards, render it wholly rational for a jury to conclude that Raymond Gonzales knowingly caused the death of Ms. Forbes by shooting her with a gun, as charged in the indictment. We hold the evidence sufficient to show murder. Compare *Foster v. State*, 639 S.W.2d 691 (Tex.Cr.App.1982).

■ Appellant received a charge from the court on voluntary manslaughter, involuntary manslaughter, and criminally negligent homicide. He claims on appeal, however, that he was essentially denied a *proper* charge on the defensive issue of voluntary manslaughter because the statutory definition of "adequate cause" submitted in the charge of the court is void due to impermissible and unconstitutional vagueness. We disagree.

V.T.C.A., Penal Code, Section 19.04(c), provides:

"'Adequate Cause' means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection."

We perceive no violation of due process in the Legislature's failure to specifically define the person of ordinary temper, a standard borrowed from the common law's "reasonable man" test and introduced to the criminal law well over a hundred years ago. See, *Regina v. Welsh*, 11 Cox Cr.Cas. 336, 338 (1869); *Maher v. People*, 10 Mich. 212, 220 (1862). No *direct* authority for such a proposition has been cited to us by appellant, nor have we been able to discover any through research indicating that most jurisdictions use the ordinary man test in manslaughter statutes. See e.g. Model Penal Code, Section 201.3, comment at 47 (Tent.Draft No. 9, 1959).

The practice commentary to V.T.C.A., Penal Code, Section 19.04, recognized by this Court in *McCartney v. State*, 542 S.W.2d 156 (Tex.Cr.App.1976), makes it quite clear that the definition of adequate cause is both objective and subjective: .

"... It is objective because it views the alleged provocation through the eyes of the ordinary man; it is subjective because the fact-finder must view from the actor's standpoint in order to view 'the condition of the mind of the accused at the time of the offense,' which is necessitated by the mens rea requirement and emphasized by Section 19.06 [V.T.C.A.], from which the quoted phrase is taken." Id. at 160.

■ Appellant seems to contend that because he is an Hispanic farm worker who was living with a Caucasian woman on a low income he should be granted more latitude in the degree of insult, etc., sufficient to enrage him. Yet appellant fails to recognize that the standard of the reasonable man, the person of ordinary temper, is employed precisely to avoid different applications of the law of manslaughter to defendants of different races, creed, color, sex or social status.[1]

We see no reason to depart from the view expressed by Judge Lattimore, in *Zimmerman v. State*, 85 Tex.Cr.R. 630, 215 S.W. 101 (1919):

"We are not the writers of the law, nor do we believe we would be justified in going beyond the statutory definition which uses the words, 'person of ordinary temper.' Our merciful law concedes to one rendered incapable of cool reflection, by anything which would produce such condition of mind in any person of ordinary temper, a less punishment for a homicide than would be otherwise inflicted, but the statutory definition is as far as we feel justified in going." Id. 215 S.W. at 104.

As Associate Justice Miller opined in *Hart v. United States:*

1. Cf. the concurring opinion of Judge Clinton with which this writer has no disagreement.

"While sympathy might at first glance suggest a more lenient rule for persons of low mentality or unstable emotions, the result would be disastrous in the uncertainty of its application. The rule suggested by appellant would become a refuge for ill-tempered, irresponsible citizens; it would put a premium upon lack of self-control and would penalize the reasonable man, the average man, the prudent man, because of the restraint which he practices in his dealings with his fellows." *Hart v. United States,* 130 F.2d 456, 458 (D.C.Cir.1942).

Any dissatisfaction with the standard's failure to consider the peculiar conditions of the individual defendant is a subject more properly addressed to the Legislature. See, e.g. Model Penal Code, Section 201.3, Comment at 47 (Tent.Draft No. 9, 1959). Appellant's ground of error is overruled.

We note that appellant has urged a pro se supplemental brief on appeal, and although appellant is not entitled to hybrid representation, we have reviewed his claim that the punishment assessed is defective for want of compliance with Article 42.-09(1), V.A.C.C.P., concerning indeterminate sentencing. Amended by Acts 1981, 67th leg., page 810, chapter 291, section 117 effective September 1, 1981. Apparently, appellant based his claim only on the court's judgment reflecting the jury's verdict that he be sentenced to confinement for fifty years. The sentence, signed by the trial judge, expressly states that appellant's term of confinement is "for a term of not less than five (5) years nor more than fifty (50) years...."

The conviction is affirmed.

CLINTON, Judge, concurring.

The majority states: "Yet appellant fails to recognize that the standard of the reasonable man, the person of ordinary temper, is employed precisely to avoid differ-

ent applications of the law of [voluntary] manslaughter to defendants of different races, creed, color, sex or social status." P. 903. That broad statement does not take into account pertinent provisions of V.T.C.A. Penal Code, § 19.06, *viz:*

"In all prosecutions for ... voluntary manslaughter, the state or the defendant shall be permitted to offer testimony as to ... all relevant facts and circumstances going to show *the condition of the mind of the accused at the time of the offense.*" [1]

Coupled together, § 19.04(c) and the quoted portion of 19.06, particularly the underscored words, render the definition of adequate cause "both objective and subjective," Practice Commentary to § 19.05. Thus, whether a cause is adequate must be measured not only by understanding "a person of ordinary temper" but also by considering the standpoint of the accused. *Ibid.*

One, and probably the best, reason "to depart from the view expressed by Judge Lattimore, in *Zimmerman v. State,* 215 S.W.[ ] 101, 85 Tex.Cr.R. 630 (*1919*)," is that when he was writing that which the majority quotes, Judge Lattimore was addressing the former manslaughter law then in effect. However, it was repealed by the "Murder Act," Acts 1927, 40th Leg., ch. 274, p. 412, § 3. That act also inserted in the penal code "a new article numbered 1257a relating to what may be proved and considered by the jury ..." See *Mercer v. State,* 111 Tex.Cr.R. 657, 13 S.W.2d 689, 691 (1928). Former article 1257a is the progenitor of § 19.06. Thus, Judge Lattimore was expounding his views without benefit of the very legislative expression now extant.

As to what Associate Justice Miller of the District of Columbia Circuit Court of Appeals opined in *Hart v. United States,* 130 F.2d 456, 458 (D.C.Cir.1942), suffice to say that, like Judge Lattimore, he did not have to treat any counterpart to article 1257a or § 19.06.

---

**1.** All emphasis is mine unless otherwise indicated.

The point of it all is that the statutory definition in § 19.04(c) is just one aspect of what a jury may consider in deciding whether an accused acted under the immediate influence of sudden passion "arising from an adequate cause." Under § 19.06 the jury also may and should take into account "all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense." Appellant does not claim that the jury was not properly charged in the latter respect. Therefore, § 19.04(c) is not vague facially or as applied for the reasons claimed by appellant.

Other than the statement questioned, with the observations made, I join the opinion of the Court.