# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-23-00246-CR

**Travis Blayne Hall, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 26TH DISTRICT COURT OF WILLIAMSON COUNTY
### NO. 21-1056-K26, THE HONORABLE DONNA GAYLE KING, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Travis Blayne Hall pleaded guilty to murdering his wife, Julie Hall. He admitted hitting her on the head three times with a wrench, putting her body in a suitcase, and placing the suitcase in his apartment complex's trash compactor.

Appellant claimed that he killed Julie under the influence of sudden passion from an argument about their relationship and finances. He testified that Julie berated him, blamed him for "everything" wrong in their relationship, and threatened to cause their adult children not to speak to him if he left her for his paramour. She ran into a bedroom while he "stewed" for "minutes or less" before storming into the bedroom. Appellant said that when Julie appeared to ignore him, he "snapped," grabbed the wrench, and unthinkingly killed her.

When asked if they found that Appellant acted under the influence of sudden passion, the jurors found unanimously, "We do not," and assessed sentence at life in prison. Appellant contends that the evidence is legally and factually insufficient to support their verdict.

We will affirm.

## BACKGROUND

Appellant and Julie met in college in 1992 and married. They had two children. Over the years, Appellant held a variety of jobs while Julie mostly worked caring for their children and home. She was diagnosed with and survived bouts with ovarian cancer and leukemia in the early 2000s while Appellant worked and arranged her care and care for their children. Appellant grew frustrated with their sexual relationship and Julie's decision not to work consistently outside the home after the children started school. Appellant worked as a chiropractor and tried to start his own practice, but that did not succeed. By 2012, the family was living temporarily in hotels in the Houston area.

In February 2012, Appellant hired a masseuse who also offered sexual services on request ("paramour"). He continued to hire her weekly at $120 per session until the summer, by which time she stopped charging him. On his birthday, Appellant told his paramour that he had left his family. He lived at her storefront for several weeks before rejoining his family who had, in the interim, moved to Georgetown. Appellant and Julie's relationship was tenser than before, with Appellant described as quieter and as if he had given up fighting. Appellant cut off contact with his paramour in 2015. Appellant and Julie continued to have financial and relationship challenges.

By 2021, Appellant was working as a plumber, and Julie was working as a teacher's aide. Their daughter described Appellant as a boiling pot that was bound to burst at some point. Because of their financial difficulties and history of evictions, Appellant and Julie moved into an apartment rented by their son.[1] Their son urged his parents to divorce, but Julie

---

[1] Their daughter had moved to another town.

2

snapped at him that she did not believe in divorce. The son gave Appellant the card of a divorce attorney and urged him to call.

Appellant returned to perusing dating sites and, on the morning of February 14, 2021, sent an email to his former paramour, telling her that his marriage was done and that he was living with his son; he omitted that he lived with Julie as well. Their in-person reunion plans were put on hold by the winter storm that paralyzed Texas in mid-February 2021, but they resumed planning as the snow and ice melted and electric power returned. On the afternoon of Thursday, February 18, 2021, Appellant reserved a hotel room in Houston for two days later.

On Thursday evening, according to Appellant, he and Julie then had a final argument; Appellant's testimony is the only evidence of any discussion they had. Julie said she was planning to quit her job at the end of the school year. Appellant complained that she was spending too much money on a wedding celebration for their daughter when they were falling behind on rent and car payments. Julie accused him of restarting his relationship with his paramour, which he eventually admitted. Appellant testified, "[S]he starts berating me, that, you know, the situation is all my fault, that the affairs is all me and the relationship with our kids is all me and our finances are all me. She conjoins it to all me, and I'm through and I'm done being bullied." Appellant testified that he told Julie he was through and that "I know what I can get to be a better relationship, and it's not with you." Appellant described what followed:

A. And she's—practically screams at me, If you go off with that whore, I'll make sure the kids never talk to you again. And she runs into the bedroom, slams the door behind her, and I am standing there in the living room just like I've been slapped in the face and—

Q. Are you angry at this point?

A. I'm angry. I'm in shock. I can't believe that this has come to this, that I'm now the ultimate bad guy and she has no part in it and doesn't care and—I sat

3

there and stewed and thought about all that stuff and how she didn't care and totally rejected me time after time again, and she's going to turn everyone against me and I—I'm just boiling and—

Q. Do you walk into the bedroom?

A. I storm in, and I'm like, We are not F'ing done with this.

Q. And what's she doing?

A. And I go in there expecting her—to see her sitting on the bed possibly on her phone or in the bathroom, and she—

Q. Well, how much time had passed from the time she leaves the room to the time you walk into it as well, roughly?

A. Minutes, if that.

Q. Minutes or less, you walk in. Go ahead.

A. And she's under the covers, her back to me, and she doesn't respond. She doesn't move. Now, the first I know I do—

Q. Respond to what? Travis, respond to what?

A. My voice, cussing, the entering. She doesn't go to sleep that easily. She's a very light sleeper, and she—

Q. So what is it you were thinking?

A. That she's just ignoring me and doesn't care about anything I had to say, and she is just totally shutting me out and is going to isolate me from my family. And I snap. I—something snaps. I hear this ringing in my ear. All sound stops except for this ringing and this hum[ming] in my ear. And I reach for the first thing that I could grab, which happens to be a wrench in my tool bag—sticking out of my tool bag on the side of my bed. And I have no idea how this happens, but I strike her.

Q. Do you have any idea how many times you struck her?

A. Three times.

Q. Where?

A. Across her head area. And I'm just—

4

Q. What were you thinking—

A. —swinging.

Q. Travis, what were you thinking when you did it?

A. I'm not thinking. I can't believe that this is happening, that—I've never had an out-of-body experience, but it was like someone else doing this and I'm watching this. And—

Q. Did she say anything in any of those strikes?

A. No. There was no—

Q. Do you know now—as you sit here today, do you know now whether or not she was asleep? Do you know?

A. I don't know for certain.

Q. But what was it you were thinking at the moment you did it?

A. I thought she was awake and ignoring me.

Q. Okay. So you do this horrible thing. Then what do you do?

A. I'm in shock. I can't believe really what I've just done. I—

Q. Travis, you said that the wrench was by your bed. Is that by design? How does that work? Is that where you usually keep it?

A. There's not a cubbyhole.

Q. Excuse me?

A. There—I commonly bring my tools in that I've been working with sometimes to oil them down, to—I have them with me. I don't necessarily have a place in—I don't have a garage. I—so I commonly bring them in, and I set them by my bed.

Other testimony explored Appellant's ultimately ineffective attempts to cover up his crime. Aside from disposing of Julie's body where it was not recovered, he partly rinsed his wrench and

kept it in his truck, failed to completely clean Julie's blood from the apartment, left her phone and purse in the bedroom when she "never" left without them, told his son that Julie was visiting her sister for the weekend when her sister would know she did not go there, texted posing as Julie using Julie's phone after the weekend using different syntax, used her credit card at a store where he was video recorded doing so, and left a notebook in the apartment containing a letter to his children confessing to the crime. Among other things, he wrote, "I thought I would get away with this—find the love I dreamed about."

Appellant's paramour testified concerning her interactions with Appellant over the week beginning with their reunion. She said that, when they met on February 20, 2021, Appellant was "casual, comfortable, happy to see me." Appellant seemed "free." After Appellant found police at his apartment on February 22, 2021, he called her and confessed that he had killed Julie. He said that Julie would never leave him or "give" him a divorce, so he solved the problem by killing her as she slept. He said he had fantasized about killing her for a few weeks because things were getting so hard. At some point, he said that he had taken out a life insurance policy on Julie and said that the children would get the money. On February 25, 2021, Appellant invited her to run away with him to Mexico, but neither of them had a passport. They talked about faking his suicide; he would write a letter to his children as a form of goodbye and leave his car on a bridge over the Houston Ship Channel to indicate that he had jumped.

## APPLICABLE LAW

A person commits the offense of murder if he "intentionally or knowingly causes the death of an individual." Tex. Penal Code § 19.02(b)(1). Ordinarily, murder is a first-degree felony. *Id.* § 19.02(c). However, if at the punishment stage of a trial the defendant proves by a

6

preponderance of the evidence the existence of sudden passion, the offense is a felony of the second degree. *Id*. § 19.02(d).

To prove that he acted with sudden passion, the defendant must prove by a preponderance of the evidence that he caused the person's death "under the immediate influence of sudden passion arising from an adequate cause." *Id*. "'Sudden passion' means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." *Id.* § 19.01(a)(2). "[S]udden passion is essentially a culpable mental state." *Moore v. State*, 969 S.W.2d 4, 10 (Tex. Crim. App. 1998). "Mental culpability is of such a nature that it generally must be inferred from the circumstances under which a prohibited act or omission occurs." *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991). "Sudden passion must arise at the time of the offense and cannot result solely from former provocation." *Moncivais v. State*, 425 S.W.3d 403, 407 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). "A defendant must prove that the homicide occurred while the passion still existed and before there was reasonable opportunity for the passion to cool." *Id.* "Anticipation of an event and preparation of a response indicates a defendant had time to deliberate over an action and did not act under the immediate influence of sudden passion." *Id.* "Moreover, neither ordinary fear nor anger alone is sufficient to establish sudden passion." *De Leon v. State*, 373 S.W.3d 644, 650 (Tex. App.—San Antonio 2012, pet. ref'd). Sudden passion is an extreme emotional and psychological state. *See Dukes v. State*, 486 S.W.3d 170, 180 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (citing *Saldivar v. State*, 980 S.W.2d 475, 506 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd)). A defendant's statement that he snapped is not by itself evidence of the type

of extreme emotional and psychological state required for sudden passion. *See Dukes*, 486 S.W.3d at 180.

"'Adequate cause' is cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." Tex. Penal Code § 19.01(a)(1). "[A]dequate cause is determined by applying the 'person of ordinary temper' standard, which is the same as the reasonable person standard." *Segovia v. State*, 467 S.W.3d 545, 557 (Tex. App.—San Antonio 2015, pet. ref'd) (quoting *Gonzales v. State*, 689 S.W.2d 900, 903 (Tex. Crim. App. 1985)). Adequate cause generally requires more than mere yelling or a personal psychological condition making an individual susceptible to a more passionate response than a person of ordinary temper would have. *McKinney v. State*, 179 S.W.3d 565, 570 (Tex. Crim. App. 2005) (yelling and pushing are not adequate causes); *Gaston v. State*, 930 S.W.2d 222, 226 (Tex. App.—Austin 1996, no pet.) (concluding that wife's "nagging, taunting, and promising a divorce and property squabble" are not adequate to cause requisite degree of emotion in person of ordinary temper to demonstrate sudden passion); *Stanley v. State*, No. 02-16-00176-CR, 2018 WL 359903, at *10 (Tex. App.—Fort Worth Jan. 11, 2018, no pet.) (mem. op., not designated for publication) (concluding record did not support conclusion that ordinary and prudent person would have perceived victim's touch of defendant's shoulder as provocation that warranted shooting victim to death); *cf. Mays v. State*, 318 S.W.3d 368, 383 (Tex. Crim. App. 2010) (explaining that appellant could not rely upon evidence of his paranoia and psychotic thinking to raise reasonable belief of another's intentions). When adequate cause is absent, even an extreme amount of passion will not meet requirements for a sudden-passion finding. *Willis v. State*, 936 S.W.2d 302, 308 (Tex. App.—Tyler 1996, pet. ref'd).

When reviewing the sufficiency of the evidence of a finding regarding sudden passion, we do not apply the constitutional sufficiency standard because the defendant must prove the defensive issue of sudden passion by only a preponderance of the evidence. *See Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Moncivais*, 425 S.W.3d at 407. Instead, we apply the "traditional Texas civil burdens of proof and standards of review," *Matlock*, 392 S.W.3d at 667, which include challenges to both the legal and factual sufficiency of the evidence, *see id.* at 670-71; *see also Petetan v. State*, 622 S.W.3d 321, 357 (Tex. Crim. App. 2021). "The civil legal sufficiency standard requires a two-step analysis." *Moncivais*, 425 S.W.3d at 407. "First, we examine the record for any evidence that supports the jury's negative finding while ignoring all evidence to the contrary." *Id*. "Second, if no evidence supports the negative finding, then we examine the entire record to determine whether the evidence establishes the [defensive issue] as a matter of law." *Id*. "We must defer to the fact finder's determination of the weight and credibility to give the testimony and the evidence at trial." *Id*. The jury is the sole judge of witness credibility and the weight to be given testimony. *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021).

For factual sufficiency, "an appellate court views the entirety of the evidence in a neutral light" and determines whether the jury's verdict "is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *Matlock*, 392 S.W.3d at 671. As with legal sufficiency, we may not substitute our judgment in place of the jury's assessment of the weight and credibility of the witnesses' testimony. *Id.*

9

**DISCUSSION**

Appellant contends that the negative finding on the sudden-passion issue was not supported by legally sufficient evidence (point of error one) or factually sufficient evidence (point of error two).

**1.    The evidence is legally sufficient to support the jury's verdict.**

The record contains evidence of planning that negates the purported suddenness of Appellant's passion and evidence that Julie's provocation was not adequate cause to render a person of ordinary temper's mind incapable of cool reflection.

Appellant took out a life insurance policy on Julie two weeks before he killed her, forged her electronic signature, and made himself the sole beneficiary; he later told his paramour that he had made the children the beneficiaries of the policy. He reportedly fantasized about killing Julie for weeks to end her misery and free himself from their marriage. He renewed contact with his paramour, told her that his marriage was over, and before murdering Julie planned to meet her after murdering Julie. He brought his toolbag into the apartment bedroom. Appellant told Julie that he could find love elsewhere; killed her after she left the room and while she lay quietly in bed with her back to him; then spent the weekend with his paramour appearing casual, comfortable, and free. He wrote in a letter to his children that he killed Julie to end her misery like a physician famed for assisting planned deaths and that he thought he would get away with it. This evidence is consistent with a planned murder rather than an impulsive, unthinking act prompted by a sudden passion.

Further, Julie's refusal to agree to a divorce and alleged threats to make sure the children would not talk to him is not evidence of an adequate cause for a sufficient sudden

10

passion. Julie's steadfast opposition to divorce did not prevent Appellant from filing for divorce. Her threats to end his relationship with their children were not within her sole power; the "children" were young adults familiar with their parents' disagreements and were capable of making their own relationships. Julie did not physically assault or threaten Appellant, had disengaged, and was lying quietly in bed with her back to Appellant when he struck. As yelling and pushing; nagging, taunting, and promising a divorce and property squabble; and touching an armed person's shoulder are not adequate cause for sudden passion, the evidence in this case supports the jury's negative finding. *See McKinney*, 179 S.W.3d at 570; *Gaston*, 930 S.W.2d at 226; *Stanley*, 2018 WL 359903, at *10.

Because ample evidence supports the jury's negative finding on the sudden-passion issue, we need not proceed to the second part of the legal sufficiency analysis. *See Moncivais*, 425 S.W.3d at 407. We overrule point of error one.

## 2.    The evidence is factually sufficient to support the verdict.

Appellant argues that the above evidence is overwhelmed by contrary evidence. He points to evidence that he was non-violent, mild-tempered, even submissive in the face of Julie's temper. There was evidence that Julie did most of the yelling in the arguments and that she could go from calm to "off the rails." He said he commonly brought his tools inside, not just on the night he killed her. Appellant described Julie's accusations that he was responsible for everything wrong in their marriage, her threats to isolate him from their children, and her berating and screaming at him before slamming the door and ignoring him as triggering a rage that caused him to have a ringing in his ears and unthinkingly grab his wrench and kill her as if someone else was doing it and he was watching. Thus, he argues, murder is so out of character

11

that he must have been provoked by sudden passion. He points to the haphazard nature of his coverup as proof that he did not plan the murder.

Factually sufficient evidence supports the negative finding. As the arbiter of credibility, the jury could have rejected Appellant's testimony that he did not plan the murder but acted with legally cognizable sudden passion. *See Moncivais*, 425 S.W.3d at 407. Appellant lied repeatedly in his coverup attempts. He lied to his paramour before the murder about having left Julie and after the murder about who benefitted from the life-insurance policy. He told shifting and conflicting stories about the nature of the letter to his children; he said it was made up for a book, that it was part of a fake suicide plot, and that it showed a real intent to kill himself. The jury could reasonably have disregarded all or any part of his testimony. *See Martin*, 635 S.W.3d at 679. The jury reasonably could have concluded based on the entire record that the evidence showed a planned murder rather than an act committed while under the immediate influence of sudden passion.

Even if the jury had concluded that Appellant acted while he was incapable of cool reflection, it reasonably could have found that the evidence did not meet the standard for adequate cause to provoke such passion. Recall that "neither ordinary fear nor anger alone is sufficient to establish sudden passion." *De Leon*, 373 S.W.3d at 650. The jury could have determined that Julie's yelling, threats, and apparent ignoring Appellant would not commonly produce the degree of rage in a person of ordinary temper that would render the mind incapable of cool reflection. *See* Tex. Penal Code § 19.01(a)(1); *Segovia*, 467 S.W.3d at 557; *see also McKinney*, 179 S.W.3d at 570; *Gaston*, 930 S.W.2d at 226; *Stanley*, 2018 WL 359903, at *10. Testimony that his experiences caused him to develop a borderline personality does not weigh on the adequate-cause analysis because that issue is "not determined by considering the defendant's

12

peculiar conditions, such as low mentality or unstable emotions" but on the reasonable-person standard. *See Segovia*, 467 S.W.3d at 556-57 (citing *Gonzales*, 689 S.W.2d at 904). The jury reasonably could have found that Julie's conduct was not an adequate cause for Appellant's actions purportedly taken in response.

Deferring to the jury's role as arbiter of credibility, the entirety of the evidence when viewed in a neutral light shows that the jury's verdict is not so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased. *See Matlock*, 392 S.W.3d at 671. We overrule point of error two.

**CONCLUSION**

We affirm the verdict and judgment.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Triana and Theofanis

Affirmed

Filed: February 21, 2025

Do Not Publish